[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-13482
_____

D.C. Docket No. 1:13-cv-00476-CB-M


EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff - Appellant,

versus

CATASTROPHE MANAGEMENT SOLUTIONS,

Defendant - Appellee.
_____

Appeal from the United States District Court
for the Southern District of Alabama
_____

(December 13, 2016)

Before JORDAN and JULIE CARNES, Circuit Judges, and ROBREÑO,[*] District
Judge.

JORDAN, Circuit Judge:

--------

[*] The Honorable Eduardo Robreño, United States District Judge for the Eastern District
of Pennsylvania, sitting by designation.

We withdraw our previous opinion, dated September 15, 2016, and published at 837 F.3d 1156, and issue this revised opinion:

The Equal Employment Opportunity Commission filed suit on behalf of Chastity Jones, a black job applicant whose offer of employment was rescinded by Catastrophe Management Solutions pursuant to its race-neutral grooming policy when she refused to cut off her dreadlocks. The EEOC alleged that CMS' conduct constituted discrimination on the basis of Ms. Jones' race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2(a)(1) & 2000e–2(m). The district court dismissed the complaint under Federal Rule of Civil Procedure 12(b)(6) because it did not plausibly allege intentional racial discrimination by CMS against Ms. Jones. *See E.E.O.C. v. Catastrophe Mgmt. Solutions*, 11 F. Supp. 3d 1139, 1142–44 (S.D. Ala. 2014). The district court also denied the EEOC's motion for leave to amend, concluding that the proposed amended complaint would be futile. The EEOC appealed.

With the benefit of oral argument, we affirm. First, the EEOC—in its proposed amended complaint and in its briefs—conflates the distinct Title VII theories of disparate treatment (the sole theory on which it is proceeding) and disparate impact (the theory it has expressly disclaimed). Second, our precedent holds that Title VII prohibits discrimination based on immutable traits, and the proposed amended complaint does not assert that dreadlocks—though culturally

2

associated with race—are an immutable characteristic of black persons. Third, we are not persuaded by the guidance in the EEOC's Compliance Manual because it conflicts with the position taken by the EEOC in an earlier administrative appeal, and because the EEOC has not persuasively explained why it changed course. Fourth, no court has accepted the EEOC's view of Title VII in a scenario like this one, and the allegations in the proposed amended complaint do not set out a plausible claim that CMS intentionally discriminated against Ms. Jones on the basis of her race.

## I

The EEOC relies on the allegations in its proposed amended complaint, *see* Br. of EEOC at 2–6, so we set out those allegations below.

## A

CMS, a claims processing company located in Mobile, Alabama, provides customer service support to insurance companies. In 2010, CMS announced that it was seeking candidates with basic computer knowledge and professional phone skills to work as customer service representatives. CMS' customer representatives do not have contact with the public, as they handle telephone calls in a large call room.

Ms. Jones, who is black, completed an online employment application for the customer service position in May of 2010, and was selected for an in-person

3

interview.  She arrived at CMS for her interview several days later dressed in a blue business suit and wearing her hair in short dreadlocks.

After waiting with a number of other applicants, Ms. Jones interviewed with a company representative to discuss the requirements of the position.  A short time later, Ms. Jones and other selected applicants were brought into a room as a group.

CMS' human resources manager, Jeannie Wilson—who is white—informed the applicants in the room, including Ms. Jones, that they had been hired.  Ms. Wilson also told the successful applicants that they would have to complete scheduled lab tests and other paperwork before beginning their employment, and she offered to meet privately with anyone who had a conflict with CMS' schedule. As of this time no one had commented on Ms. Jones' hair.

Following the meeting, Ms. Jones met with Ms. Wilson privately to discuss a scheduling conflict she had and to request to change her lab test date.  Ms. Wilson told Ms. Jones that she could return at a different time for the lab test.

Before Ms. Jones got up to leave, Ms. Wilson asked her whether she had her hair in dreadlocks.  Ms. Jones said yes, and Ms. Wilson replied that CMS could not hire her "with the dreadlocks."  When Ms. Jones asked what the problem was, Ms. Wilson said "they tend to get messy, although I'm not saying yours are, but you know what I'm talking about."  Ms. Wilson told Ms. Jones about a male applicant who was asked to cut off his dreadlocks in order to obtain a job with CMS.

4

When Ms. Jones said that she would not cut her hair, Ms. Wilson told her that CMS could not hire her, and asked her to return the paperwork she had been given. Ms. Jones did as requested and left.

At the time, CMS had a race-neutral grooming policy which read as follows: "All personnel are expected to be dressed and groomed in a manner that projects a professional and businesslike image while adhering to company and industry standards and/or guidelines. . . . [H]airstyle should reflect a business/professional image. No excessive hairstyles or unusual colors are acceptable[.]"

**B**

Dreadlocks, according to the proposed amended complaint, are "a manner of wearing hair that is common for black people and suitable for black hair texture. Dreadlocks are formed in a black person's hair naturally, without any manipulation, or by manual manipulation of hair into larger coils."

The EEOC alleged that the term dreadlock originated during the slave trade in the early history of the United States. "During the forced transportation of Africans across the ocean, their hair became matted with blood, feces, urine, sweat, tears, and dirt. Upon observing them, some slave traders referred to the slaves' hair as 'dreadful,'" and dreadlock became a "commonly used word to refer to the locks that had formed during the slaves' long trips across the ocean."

5

## C

The proposed amended complaint also contained some legal conclusions about the concept of race. First, the EEOC stated that race "is a social construct and has no biological definition." Second, the EEOC asserted that "the concept of race is not limited to or defined by immutable physical characteristics." Third, according to the EEOC Compliance Manual, the "concept of race encompasses cultural characteristics related to race or ethnicity," including "grooming practices." Fourth, although some non-black persons "have a hair texture that would allow the hair to lock, dreadlocks are nonetheless a racial characteristic, just as skin color is a racial characteristic."

Playing off these legal conclusions, the proposed amended complaint set out allegations about black persons and their hair. The hair of black persons grows "in very tight coarse coils," which is different than the hair of white persons. "Historically, the texture of hair has been used as a substantial determiner of race," and "dreadlocks are a method of hair styling suitable for the texture of black hair and [are] culturally associated" with black persons. When black persons "choose to wear and display their hair in its natural texture in the workplace, rather than straightening it or hiding it, they are often stereotyped as not being 'teamplayers,' 'radicals,' 'troublemakers,' or not sufficiently assimilated into the corporate and professional world of employment." Significantly, the proposed amended

complaint did not allege that dreadlocks are an immutable characteristic of black persons.

## II

Our review in this appeal is plenary.  Like the district court, we accept as true the well-pleaded factual allegations in the proposed amended complaint and draw all reasonable inferences in the EEOC's favor.  *See, e.g.*, *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1255 (11th Cir. 2015) (dismissal of a complaint for failure to state a claim); *St. Charles Foods, Inc. v. America's Favorite Chicken Co.*, 198 F.3d 815, 822 (11th Cir. 1999) (denial of a motion for leave to amend due to futility).  The legal conclusions in the proposed amended complaint, however, are not presumed to be true.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 679–81 (2009); *Franklin v. Curry*, 738 F.3d 1246, 1248 n.1 (11th Cir. 2013).

A complaint must contain sufficient factual allegations to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In a Title VII case like this one, the EEOC had to set out enough "factual content t[o] allow[ ] [a] court to draw the reasonable inference" that CMS is liable for the intentional racial discrimination alleged.  *See Iqbal*, 556 U.S. at 678–79 (explaining that the "plausibility standard" requires more than a "mere possibility" but is "not akin to a 'probability requirement'").

7

## III[1]

The EEOC claimed in its proposed amended complaint that a "prohibition of dreadlocks in the workplace constitutes race discrimination because dreadlocks are a manner of wearing the hair that is physiologically and culturally associated with people of African descent."  So, according to the EEOC, the decision of CMS to "interpret its race-neutral written grooming policy to ban the wearing of dreadlocks constitutes an employment practice that discriminates on the basis of race."

The district court dismissed the initial complaint, and concluded that the proposed amended complaint was futile, because "Title VII prohibits discrimination on the basis of immutable characteristics, such as race, color, or natural origin," and "[a] hairstyle, even one more closely associated with a particular ethnic group, is a mutable characteristic."  *Catastrophe Mgmt.*, 11 F. Supp. 3d at 1143 (order granting motion to dismiss).  The district court was not swayed by the EEOC's contention that the allegations were sufficient because "hairstyle can be a determinant of racial identity," explaining that other courts had

---

[1] We conclude that the notice of appeal was timely because the EEOC's motion for leave to amend—which in part challenged the basis for the district court's dismissal of the original complaint—is properly treated as a Rule 59(e) motion which tolled the time for appeal.  *See Giuffre v. Deutsche Bank Nat. Trust Co.*, 759 F.3d 134, 137 (1st Cir. 2014) (holding that a plaintiff's post-judgment motion for leave to file an amended complaint tolled the time to appeal because "[i]n substance, [the] motion challenged the legal foundation of the dismissal order and called on the judge to either revoke that order or alter it to allow him leave to amend"); *Trotter v. Regents of Univ. of N.M.*, 219 F.3d 1179, 1183 (10th Cir. 2000) (holding that a Rule 15 motion filed within the time limit for filing a Rule 59(e) motion tolls the time for filing a notice of appeal); *Bodin v. Gulf Oil Corp.*, 877 F.2d 438, 440 (5th Cir. 1989) (holding that a motion for leave to amend constituted a timely Rule 59(e) motion, and thus, the time for filing a notice of appeal commenced when the district court denied the motion).

rejected that argument. *See id*. The district court also declined the EEOC's invitation to discard the immutable/mutable distinction for Title VII race discrimination claims. *See id. See also* D.E. 27 at 1–2 (order denying leave to amend because the EEOC had already presented its more detailed allegations as legal arguments in support of the initial complaint, and those arguments had been rejected).

The EEOC advances a number of arguments on appeal in support of its position that denying a black person employment on the basis of her dreadlocks through the application of a race-neutral grooming policy constitutes intentional discrimination on the basis of race in violation of Title VII. The arguments, which build on each other, are that dreadlocks are a natural outgrowth of the immutable trait of black hair texture; that the dreadlocks hairstyle is directly associated with the immutable trait of race; that dreadlocks can be a symbolic expression of racial pride; and that targeting dreadlocks as a basis for employment can be a form of racial stereotyping. *See* Br. of EEOC at 14–39.

## A

Before we address these arguments, we discuss an overarching problem concerning the EEOC's liability theory. Despite some loose language in its proposed amended complaint, the EEOC confirmed at oral argument that it is proceeding only on a disparate treatment theory under 42 U.S.C. § 2000e-2(a)(1)

9

(making it "unlawful [for a covered employer] to fail or refuse to hire or to discharge any individual . . . because of such individual's race, color, religion, sex or national origin"), and is not pursuing a disparate impact theory under 42 U.S.C. § 2000e-2(k)(1) (permitting disparate impact claims for unlawful employment practices and setting out applicable burdens of proof).

This matters because the two theories are not interchangeable, and "courts must be careful to distinguish between the[m.]" *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003). *See also E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1283 (11th Cir. 2000) (concluding that allowing plaintiffs who alleged disparate treatment to assert a disparate impact claim "would unwisely conflate the distinct theories of disparate impact and disparate treatment"). To prevail on a disparate treatment claim, a Title VII plaintiff must demonstrate that an employer intentionally discriminated against her on the basis of a protected characteristic. *See Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). In contrast, a disparate impact claim does not require proof of discriminatory intent. A disparate impact claim targets an employment practice that has an actual, though not necessarily deliberate, adverse impact on protected groups. *See id.* Given the EEOC's disparate treatment claim, the proposed amended complaint had to contain sufficient factual allegations to set out a plausible claim that CMS intentionally discriminated against Ms. Jones, individually, because of her race.

10

Despite its decision to assert only a disparate treatment claim, the EEOC at times conflates the two liability theories, making disparate impact arguments in support of its disparate treatment claim. *See* Br. of Chamber of Commerce of the United States as *Amicus Curiae* at 14–19 (pointing this out).  The EEOC, for example, faults the district court for not allowing expert testimony on the "racial *impact* of a dreadlock ban" and for failing to acknowledge "the critical *disadvantage* at which the dreadlock ban places Black applicants."  Br. of EEOC at 7–8, 18 (emphasis added).  It also asserts that "the people most adversely and significantly *affected* by a dreadlocks ban, such as CMS', are African-Americans." *Id.* at 31 (emphasis added).  And it argues that "a policy which critically *disadvantages or affects* members of one group over another" can support an intentional discrimination claim.  *See* Reply Br. of EEOC at 16 (emphasis added). Because this is a disparate treatment case, and only a disparate treatment case, we do not address further the EEOC's arguments that CMS' race-neutral grooming policy had (or potentially had) a disproportionate effect on other black job applicants.[2]

---

[2]  Statistical evidence, of course, can sometimes be probative of intentional discrimination, *see, e.g.*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335–40 & n.20 (1977), but the EEOC did not allege, and does not claim, that there is statistical evidence showing (or allowing a reasonable inference of) a pattern or practice of disparate treatment on the part of CMS.  Nor is there any claim that CMS applied its grooming policy differently to black applicants or employees, as was the case in *Hollins v. Atl. Co., Inc.*, 188 F.3d 652, 661 (6th Cir. 1999).

## B

In its notice of supplemental authority the EEOC relies on the Supreme Court's recent decision in *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338 (2015), a case involving 42 U.S.C. § 2000e(k)—a provision of the Pregnancy Discrimination Act—to support its use of disparate impact arguments in this action. *Young*, however, does not work a dramatic shift in disparate treatment jurisprudence.

In *Young*, the Supreme Court dealt with the accommodation requirements of the PDA. Specifically, it considered how to implement the statutory mandate that employers treat pregnancy-related disabilities like nonpregnancy-related disabilities in a situation where an employer does not treat all nonpregnancy-related disabilities alike. *Young* held that a pregnant employee who seeks to show disparate treatment in such a scenario may do so through the application of the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Young*, 135 S. Ct. at 1353–54. If an employer offers apparently legitimate reasons for failing to accommodate pregnant employees, the plaintiff may assert that the proffered reasons are pretextual by providing "sufficient evidence that the employer's policies impose a significant burden on pregnant workers, and that the employer's 'legitimate, nondiscriminatory' reasons are not sufficiently strong to justify the burden, but rather—when considered along

12

with the burden imposed—give rise to an inference of intentional discrimination." *Id.* at 1354. For example, a plaintiff may provide evidence that an employer accommodates a large percentage of nonpregnant workers while failing to accommodate a large percentage of pregnant workers. *See id.* at 1354–55.

The rationale and holding in *Young* are based on, and therefore limited to, the language in a specific provision of the PDA. *Young* is not, as the EEOC suggests, automatically transferable to a disparate treatment case under Title VII involving allegations of intentional racial discrimination.

Despite the textual differences between the Title VII disparate treatment provision at issue here (§ 2000e-2(a)(1)) and the PDA provision at issue in *Young* (§ 2000e(k)), the EEOC argues that the following language from *Young* supports its use of disparate impact concepts in a disparate treatment case:

> [D]isparate-treatment law normally permits an employer to implement policies that are not intended to harm members of a protected class, even if their implementation sometimes harms those members, as long as the employer has a legitimate, nondiscriminatory, nonpretextual reason for doing so.

135 S. Ct. at 1350 (internal citations omitted). The quoted passage, however, merely explains that disparate treatment liability attaches only when an employer *intentionally* harms members of a protected group. It summarizes the familiar framework courts use to assess disparate treatment claims at summary judgment, where direct proof of intentional discrimination is unavailable: the *McDonnell*

13

*Douglas* burden-shifting framework, which places the burden on the employer to articulate a legitimate reason for taking an adverse employment action once an employee establishes a *prima facie* case.

We do not read the passage from *Young* in the inverse to stand for the proposition that an employer's neutral policy can engender disparate treatment liability merely because it has an unintended adverse effect on members of a protected group. The crux of the disparate treatment inquiry, and the question the *McDonnell Douglas* framework seeks to answer, is whether the employer intentionally discriminated against particular persons on an impermissible basis, not whether there was a disparate impact on a protected group as a whole. An allegation of adverse consequences, without more, is not sufficient to state a claim for disparate treatment. *Cf. id.* at 1355 ("the continued focus on whether the plaintiff has introduced sufficient evidence to give rise to an inference of *intentional* discrimination avoids confusing the disparate-treatment and disparate-impact doctrines").

## IV

The question in a disparate treatment case is "whether the protected trait actually motivated the employer's decision." *Raytheon*, 540 U.S. at 52 (ellipses and internal quotation marks omitted). Generally speaking, "[a] plaintiff can prove disparate treatment . . . by direct evidence that a workplace policy, practice, or

decision relies expressly on a protected characteristic, or . . . by [circumstantial evidence] using the burden-shifting framework set forth in *McDonnell Douglas*." *Young*, 135 S. Ct. at 1345. *See also Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 n.3 (11th Cir. 2005) (explaining that *McDonnell Douglas* "is not the exclusive means" for showing intentional discrimination through circumstantial evidence).

Title VII does not define the term "race." And, in the more than 50 years since Title VII was enacted, the EEOC has not seen fit to issue a regulation defining the term. *See* EEOC Compliance Manual, § 15-II, at 4 (2006) ("Title VII does not contain a definition of 'race,' nor has the Commission adopted one."). This appeal requires us to consider, at least in part, what "race" encompasses under Title VII because the EEOC maintains that "if [ ] individual expression is tied to a protected trait, such as race, discrimination based on such expression is a violation of the law." Br. of EEOC at 20.

## A

"The meaning of the word 'race' in Title VII is, like any other question of statutory interpretation, a question of law for the court." *Village of Freeport v. Barrella*, 814 F.3d 594, 607 (2d Cir. 2016). When words are not defined in a statute, they are "interpreted as taking their ordinary, contemporary, common meaning," *Sandifer v. U.S. Steel Corp.*, 134 S. Ct. 870, 876 (2014) (citation and

internal quotation marks omitted), and one of the ways to figure out that meaning is by looking at dictionaries in existence around the time of enactment. *See, e.g.*, *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 609–12 (1987) (consulting 19th century dictionaries to determine the meaning of "race" in a case arising under 42 U.S.C. § 1981, which became law in 1866).

In the 1960s, as today, "race" was a complex concept that defied a single definition.  Take, for example, the following discussion in a leading 1961 dictionary: "In technical discriminations, all more or less controversial and often lending themselves to great popular misunderstanding or misuse, RACE is anthropological and ethnological in force, usu[ally] implying a physical type with certain underlying characteristics, as a particular color of skin or shape of skull . . . although sometimes, and most controversially, other presumed factors are chosen, such as place of origin . . . or common root language."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1870 (unabridged 1961).

Nevertheless, most dictionaries at that time tied "race" to common physical characteristics or traits existing through ancestry, descent, or heredity.  *See id.* (defining "race" as "the descendants of a common ancestor: a family, tribe, people, or nation belonging to the same stock" or "a class or kind of individuals with common characteristics, interests, appearance, or habits as if derived from a

16

common ancestor," or "a division of mankind possessing traits that are transmissible by descent and sufficient to characterize it as a distinct human type (Caucasian ~) (Mongoloid ~)"); A DICTIONARY OF THE SOCIAL SCIENCES 569 (Julius Gould & William Kolb eds. 1964) ("A *race* is a subdivision of a species, individual members of which display with some frequency a number of hereditary attributes that have become associated with one another in some measure through considerable degree of in-breeding among the ancestors of the group during a substantial part of their recent evolution."); A DICTIONARY OF SOCIOLOGY 142 (G. Duncan Mitchell ed. 1968) ("Biologically speaking the concept of *race* refers to a population sharing a gene-pool giving rise to a characteristic distribution of physical characteristics determined by heredity.  There are no clear cut boundaries between racial groups thus defined and considerable variations may be exhibited within races.").   One specialty dictionary, while defining "race" as an "anthropological term denoting a large group of persons distinguished by significant hereditary physical traits," cautioned that "[a] common misconception is that cultural traits sufficiently differentiate races."  DICTIONARY OF POLITICAL SCIENCE 440 (Joseph Dunne ed. 1964).

From the sources we have been able to review, it appears more likely than not that "race," as a matter of language and usage, referred to common physical characteristics shared by a group of people and transmitted by their ancestors over

17

time.  Although the period dictionaries did not use the word "immutable" to describe such common characteristics, it is not much of a linguistic stretch to think that such characteristics are a matter of birth, and not culture.

There is little support for the position of the EEOC that the 1964 Congress meant for Title VII to protect "individual expression . . . tied to a protected race." Br. of EEOC at 20.  Indeed, from a legal standpoint, it appears that "race" was then mostly understood in terms of inherited physical characteristics.  *See* BLACK'S LAW DICTIONARY 1423 (4th ed. 1951) ("Race.  An ethnical stock; a great division of mankind having in common certain distinguishing physical peculiarities constituting a comprehensive class appearing to be derived from a distinct primitive source.  A tribal or national stock, a division or subdivision of one of the great racial stocks of mankind distinguished by minor peculiarities.  Descent.") (citing cases).

It may be that today "race" is recognized as a "social construct," *Ho by Ho v. San Francisco Unified Sch. Dist.*, 147 F.3d 854, 863 (9th Cir. 1998), rather than an absolute biological truth.  *See also Al-Khazraji*, 481 U.S. at 610 n.4 (noting that some, but not all, scientists have concluded that "racial classifications are for the most part sociopolitical, rather than biological, in nature"); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1441 (4th ed. 2009) (usage note for "race": "The notion of race is nearly as problematic from a scientific point

18

of view as it is from a social one.").   But our possible current reality does not tell us what the country's collective zeitgeist was when Congress enacted Title VII half a century ago.  "That race is essentially only a very powerful idea and not at all a biological fact is, again, an emerging contemporary understanding of the meaning of race."  Rhonda V. Magee Andrews, *The Third Reconstruction: An Alternative to Race Consciousness and Colorblindness in Post-Slavery America*, 54 ALA. L. REV. 483, 515 (2003).[3]

## B

If we assume, however, that the quest for the ordinary understanding of "race" in the 1960s does not have a clear winner, then we must look for answers elsewhere.  Some cases from the former Fifth Circuit provide us with binding guidance, giving some credence to Felix Frankfurter's adage that "[n]o judge writes on a wholly clean slate."  Walter Hamilton, *Preview of a Justice*, 48 YALE

---

[3] Of note, some contemporary judicial decisions and dictionaries still provide understandings of "race" tied to biological and physical characteristics.  *See, e.g.*, *Abdullahi v. Prada USA Corp.*, 520 F.3d 710, 712 (7th Cir. 2008) (Posner, J.) ("A racial group as the term is generally used in the United States today is a group having a common ancestry and distinct physical traits."); 2 SHORTER OXFORD ENGLISH DICTIONARY 2445 (5th ed. 2002) (defining "race" in part as "a group or set, esp. of people, having a common feature or features," or "a group of living things connected by common descent or origin," or "[a]ny of the major divisions of humankind, having in common distinct physical features or ethnic background").  And in the Geneva Convention Implementation Act of 1987, legislation that post-dated Title VII by about two decades, Congress defined the term "racial group" as "a set of individuals whose identity as such is distinctive in terms of physical characteristics or biological descent."  18 U.S.C. § 1093(6).  By citing to this provision, we do not mean to suggest that the definition of a term in one statute can be automatically used when the same term is undefined in a separate statute.  We merely point out that in the late 1980s Congress still thought of "race," in at least one context, as including common physical characteristics.

L.J. 819, 821 (1939) (quoting FELIX FRANKFURTER, THE COMMERCE CLAUSE UNDER MARSHALL, TANEY, AND WAITE 12 (1937)).  As we explain below, those cases teach that Title VII protects against discrimination based on immutable characteristics.

In *Willingham v. Macon Tel. Publ'g Co.*, 507 F.2d 1084 (5th Cir. 1975) (en banc), we addressed a Title VII sex discrimination claim by a male job applicant who was denied a position because his hair was too long.  Although the employer interpreted its neutral dress/grooming policy to prohibit the wearing of long hair only by men, and although the plaintiff argued that he was the victim of sexual stereotyping (i.e., the view that only women should have long hair), we affirmed the grant of summary judgment in favor of the employer.  *See id.* at 1092–93.

We held in *Willingham* that "[e]qual employment opportunity," which was the purpose of Title VII, "may be secured only when employers are barred from discriminating against employees on the basis of immutable characteristics, such as race and national origin.  Similarly, an employer cannot have one hiring policy for men and another for women *if* the distinction is based on some fundamental right. But a hiring policy that distinguishes on some other ground, such as grooming or length of hair, is related more closely to the employer's choice of how to run his business than equality of employment opportunity."  *Id.* at 1091.  We "adopt[ed] the view . . . that distinctions in employment practices between men and women on

20

the basis of something other than immutable or protected characteristics do not inhibit employment *opportunity* in violation of [Title VII]." *Id.* at 1092. And we approved the district court's alternative ground for affirming the grant of summary judgment in favor of the employer—that because grooming and hair standards were also imposed on female employees, men and women were treated equally. *See id.* In closing, we reiterated that "[p]rivate employers are prohibited from using different hiring policies for men and women only when the distinctions used relate to immutable characteristics or legally protected rights." *Id.*[4]

*Willingham* involved hair length in the context of a sex discrimination claim, but in *Garcia v. Gloor*, 618 F.2d 264 (5th Cir. 1980), we applied the immutable characteristic limitation to national origin, another of Title VII's protected categories. In *Garcia* a bilingual Mexican-American employee who worked as a salesperson was fired for speaking Spanish to a co-worker on the job in violation of his employer's English-only policy, and he alleged that his termination was based on his national origin in violation of Title VII (which we referred to as the "EEO Act"). We affirmed the district court's judgment in favor of the employer following a bench trial. We noted that an expert witness called by the employee had "testified that the Spanish language is the most important aspect of ethnic

---

[4] On several occasions we have reaffirmed the central holding of *Willingham* that Title VII protects against discrimination based on immutable characteristics, i.e., those that an employee is born with or cannot change. *See, e.g.*, *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1389 (11th Cir. 1998); *Gilchrist v. Bolger*, 733 F.2d 1551, 1553 (11th Cir. 1984).

identification for Mexican-Americans, and it is to them what skin color is to others," and that testimony formed part of the basis for the claim that the employer's policy was unlawful. *See id.* at 267. Although the district court had found that there were other reasons for the employee's dismissal, we assumed that the use of Spanish was a significant factor in the employer's decision. *See id.* at 268.

We explained that neither Title VII nor common understanding "equates national origin with the language that one chooses to speak," and noted that the English-only rule was not applied to the employee as a "covert basis for national origin discrimination." *Id.* Though the employee argued that he was discriminated against on the basis of national origin "because national origin influences or determines his language preference," we were unpersuaded because the employee was bilingual and was allowed to speak Spanish during breaks. *Id.* And even if the employer had no genuine business need for the English-only policy, we said that "[n]ational origin must not be confused with ethnic or sociocultural traits or an unrelated status, such as citizenship or alienage." *Id.* at 269. Citing *Willingham*, we emphasized that Title VII "focuses its laser of prohibition" on discriminatory acts based on matters "that are either beyond the victim's power to alter, or that impose a burden on an employee on one of the prohibited bases." *Id.*

The employee in *Garcia* also argued that the employer's English-only policy was "discriminatory in impact, even if that result was not intentional, because it was likely to be violated only by Hispanic-Americans and that, therefore, they ha[d] a higher risk of incurring penalties." *Id.* at 270. We rejected this argument as well because "there is no disparate impact if the rule is one that the affected employee can readily observe and nonobservance is a matter of individual preference," and Title VII "does not support an interpretation that equates the language an employee prefers to use with his national origin." *Id.*

What we take away from *Willingham* and *Garcia* is that, as a general matter, Title VII protects persons in covered categories with respect to their immutable characteristics, but not their cultural practices. *See Willingham*, 507 F.2d at 1092; *Garcia*, 618 F.2d at 269. And although these two decisions have been criticized by some, *see, e.g.*, Camille Gear Rich, *Performing Racial and Ethnic Identity: Discrimination by Proxy and the Future of Title VII*, 79 N.Y.U. L. REV. 1134, 1213–21 (2004),    we are not free, as a later panel, to discard the immutable/mutable distinction they set out. *See Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1076 (11th Cir. 2000) ("[T]he prior panel precedent rule is not dependent upon a subsequent panel's appraisal of the initial decision's correctness. Nor is the application of the rule dependent upon the skill of the attorneys or

wisdom of the judges involved in the prior decision—upon what was argued or considered.").

We recognize that the distinction between immutable and mutable characteristics of race can sometimes be a fine (and difficult) one, but it is a line that courts have drawn.  So, for example, discrimination on the basis of black hair texture (an immutable characteristic) is prohibited by Title VII, while adverse action on the basis of black hairstyle (a mutable choice) is not.  *Compare, e.g.*, *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 168 (7th Cir. 1976) (en banc) (recognizing a claim for racial discrimination based on the plaintiff's allegation that she was denied a promotion because she wore her hair in a natural Afro), *with, e.g.*, *Rogers v. Am. Airlines, Inc.*, 527 F. Supp. 229, 232 (S.D.N.Y. 1981) (holding that a grooming policy prohibiting an all-braided hairstyle did not constitute racial discrimination, and distinguishing policies that prohibit Afros, because braids are not an immutable characteristic but rather "the product of . . . artifice").  As one commentator has put it, "the concept of immutability," though not perfect, "provides a rationale for the protected categories encompassed within the antidiscrimination statutes."  Sharona Hoffman, *The Importance of Immutability in Employment Discrimination Law*, 52 WM. & MARY L. REV. 1483, 1514 (2011).

Critically, the EEOC's proposed amended complaint did not allege that dreadlocks themselves are an immutable characteristic of black persons, and in fact stated that black persons choose to wear dreadlocks because that hairstyle is historically, physiologically, and culturally associated with their race. That dreadlocks are a "natural outgrowth" of the texture of black hair does not make them an immutable characteristic of race. Under *Willingham* and *Garcia*, the EEOC failed to state a plausible claim that CMS intentionally discriminated against Ms. Jones on the basis of her race by asking her to cut her dreadlocks pursuant to its race-neutral grooming policy. The EEOC's allegations—individually or collectively—do not suggest that CMS used that policy as proxy for intentional racial discrimination.[5]

## C

The EEOC admitted in its proposed amended complaint that CMS' grooming policy is race-neutral, but claimed that a "prohibition on dreadlocks in the workplace constitutes race discrimination" because dreadlocks are a racial characteristic, i.e., they "are a manner of wearing the hair that is physiologically and culturally associated with people of African descent." So, as noted earlier, the

---

[5] The EEOC did assert that dreadlocks are an immutable characteristic of black persons, but it made that assertion (which conflicted with what the proposed amended complaint alleged) only in its motion for leave to amend. *See* D.E. 21 at 1. We do not consider this assertion, for facts contained in a motion or brief "cannot substitute for missing allegations in the complaint." *Kedzierski v. Kedzierski*, 899 F.2d 681, 684 (7th Cir. 1990). *Accord Associated Press v. All Headline News Corp.*, 608 F. Supp. 2d 454, 464 (S.D.N.Y. 2009) ("Conclusory assertions in a memorandum of law are not a substitute for plausible allegations in a complaint.").

claim that CMS intentionally discriminated against Ms. Jones on the basis of her race depends on the EEOC's conception of what "race" means (and how far it extends) under Title VII. *See* Br. of EEOC at 20 ("In the Title VII context, if the individual expression is tied to a protected race, discrimination based on such expression is a violation of the law.").

In support of its interpretation of Title VII, the EEOC relies on its own Compliance Manual. *See* EEOC Compliance Manual, § 15-II, at 4 (2006) ("Title VII prohibits employment discrimination against a person because of cultural characteristics often linked to race or ethnicity, such as a person's name, cultural dress and grooming practices, or accent or manner of speech."). But even if we could ignore *Willingham* and *Garcia*, the Compliance Manual does not save the day for the EEOC.

"[T]he rulings, interpretations, and opinions" of an agency charged with enforcing a particular statute, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The Compliance Manual, therefore, is entitled to deference "only to the extent that [it has] the power to persuade." *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) (citation and internal quotation marks omitted). Factors relevant to determining the persuasiveness of the Compliance

26

Manual, and thus the weight given to the EEOC's guidance, include "the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements[.]" *Skidmore*, 323 U.S. at 140.

The Compliance Manual contravenes the position the EEOC took in an administrative appeal less than a decade ago. *See Thomas v. Chertoff*, Appeal No. 0120083515, 2008 WL 4773208, at *1 (E.E.O.C. Office of Federal Operations Oct. 24, 2008) (concluding, in line with federal cases like *Willingham* and *Rogers*, that a grooming policy interpreted to prohibit dreadlocks and similar hairstyles lies "outside the scope of federal employment discrimination statutes," even when the prohibition targets "hairstyles generally associated with a particular race"). The EEOC attempts to characterize *Thomas* as a case about "hair length," which it concedes is not an immutable trait, as opposed to "natural hair texture" or the "other racial characteristics presented here." Reply Br. of EEOC at 27 n.5. That is not a basis for distinction, however, because the complainant in *Thomas* specifically disputed the employer's hair length policy in the context of "African American males who wear ethnic hair styles such as braids." *See Thomas*, 2008 WL 4773208, at *1. And the Commission, in dismissing his complaint, cited *Willingham* and *Rogers* approvingly to support the proposition that "prohibitions against 'ethnic' hairstyles generally associated with a particular race or ethnic group" are "typically outside the scope of federal employment discrimination

statutes because they do not discriminate on the basis of immutable characteristics." *Id.* In our view, the Compliance Manual is a change of course from *Thomas* and, because the EEOC has not provided a reasoned justification for this shift, we choose to not give its guidance much deference or weight in determining the scope of Title VII's prohibition of racial discrimination. *See, e.g.*, *Young*, 135 S. Ct. at 1352 (declining to rely significantly on the EEOC Compliance Manual because its guidelines were promulgated recently, took a position about which the EEOC's previous guidelines were silent, and contradicted positions the EEOC had previously taken).

The Compliance Manual also runs headlong into a wall of contrary caselaw. In the words of a leading treatise, "[c]ourts generally have upheld facially neutral policies regarding *mutable* characteristics, such as facial hair, despite claims that the policy has an adverse impact on members of a particular race or infringes on the expression of cultural pride and identification." BARBARA LINDEMANN & PAUL GROSSMAN, 1 EMPLOYMENT DISCRIMINATION LAW 6-5 (5th ed. 2012).

As far as we can tell, every court to have considered the issue has rejected the argument that Title VII protects hairstyles culturally associated with race. *See Cooper v. Am. Airlines, Inc.*, 149 F.3d 1167, 1998 WL 276235, at *1 (4th Cir. May 26, 1998) (upholding district court's 12(b)(6) dismissal of claims based on a grooming policy requiring that braided hairstyles be secured to the head or at the

nape of the neck); *Campbell v. Alabama Dep't of Corr.*, No. 2:13-CV-00106-RDP, 2013 WL 2248086, at \*2 (N.D. Ala. May 20, 2013) ("A dreadlock hairstyle, like hair length, is not an immutable characteristic."); *Pitts v. Wild Adventures, Inc.*, No. CIV.A.7:06-CV-62-HL, 2008 WL 1899306, at \*5–6 (M.D. Ga. Apr. 25, 2008) (holding that a grooming policy which prohibited dreadlocks and cornrows was outside the scope of federal employment discrimination statutes because it did not discriminate on the basis of immutable characteristics); *Eatman v. United Parcel Serv.*, 194 F. Supp. 2d 256, 259–67 (S.D.N.Y. 2002) (holding that an employer's policy prohibiting "unconventional" hairstyles, including dreadlocks, braids, and cornrows, was not racially discriminatory in violation of Title VII); *McBride v. Lawstaf, Inc.*, No. CIV. A.1:96-CV-0196C, 1996 WL 755779, at \*2 (N.D. Ga. Sept. 19, 1996) (holding that a grooming policy prohibiting braided hairstyles does not violate Title VII); *Rogers,* 527 F. Supp. at 232 (holding that a grooming policy prohibiting an all-braided hairstyle did not constitute racial discrimination, and distinguishing policies that prohibit Afros, because braids are not an immutable characteristic but rather "the product of . . . artifice"); *Carswell v. Peachford Hosp.*, No. C80-222A, 1981 WL 224, at \*2 (N.D. Ga. May 26, 1981) ("There is no evidence, and this court cannot conclude, that the wearing of beads in one's hair is an immutable characteristic, such as national origin, race, or sex.  Further, this court cannot conclude that the prohibition of beads in the hair by an employer is a

29

subterfuge for discrimination."); *Wofford v. Safeway Stores, Inc.*, 78 F.R.D. 460, 470 (N.D. Cal. 1978) (explaining that the "even-handed application of reasonable grooming regulations has uniformly been held not to constitute discrimination on the basis of race") (internal citations omitted); *Thomas v. Firestone Tire & Rubber Co.*, 392 F. Supp. 373, 375 (N.D. Tex. 1975) (holding that a grooming policy regulating hair length and facial hair, which was applied even-handedly to employees of all races, did not violate Title VII or 42 U.S.C. § 1981). *See also Brown v. D.C. Transit System*, 523 F.2d 725, 726 (D.C. Cir. 1975) (rejecting claim by black male employees that race-neutral grooming regulation, which prohibited most facial hair, violated Title VII despite contention by employees that the regulation was "an 'extreme and gross suppression of them as black men and (was) a badge of slavery' depriving them 'of their racial identity and virility'").

## D

We would be remiss if we did not acknowledge that, in the last several decades, there have been some calls for courts to interpret Title VII more expansively by eliminating the biological conception of "race" and encompassing cultural characteristics associated with race. But even those calling for such an interpretive change have different visions (however subtle) about how "race" should be defined. *Compare, e.g.*, Ian F. Haney Lopez, *The Social Construction of Race: Some Observations on Illusion, Fabrication, and Choice*, 29 HARV. C.R.-

30

C.L. L. REV. 1, 7 (1994) (defining "race" as "a vast group of people loosely bound together by historically contingent, socially significant elements of their morphology and/or ancestry"), and Rich, *Performing Racial and Ethnic Identity*, 79 N.Y.U. L. REV. at 1142 ("There is an urgent need to redefine Title VII's definition of race and ethnicity to include both biological, visible racial/ethnic features and performed features associated with racial and ethnic identity."), *with, e.g.,* D. Wendy Greene, *Title VII: What's Hair (and Other Race-Based Characteristics) Got to Do With It?*, 79 U. COLO. L. REV. 1355, 1385 (2008) ("Race includes physical appearances and behaviors that society, historically and presently, commonly associates with a particular racial group, even when the physical appearances and behavior are not 'uniquely' or 'exclusively' 'performed' by, or attributed to a particular racial group."), and Barbara J. Flagg, *Fashioning a Title VII Remedy for Transparently White Subjective Decisionmaking*, 104 YALE L. J. 2009, 2012 (1995)  (suggesting that discrimination on the basis of race might include "personal characteristics that . . . intersect seamlessly with [one's racial] self-definition").

Yet the call for interpreting "race" as including culture has not been unanimous.  This is in part because culture itself is (or can be) a very broad and ever-changing concept.  *See, e.g.*, Richard T. Ford, *Race as Culture: Why Not?*, 47 U.C.L.A. L. REV. 1803, 1813 (2000) ("Culture is a much more problematic

category for legal intervention than race, because culture in a broad sense encompasses almost any possible motivation for human behavior."). *Cf.* Annelise Riles, *Cultural Conflicts*, 71 L. & CONTEMP. PROBS. 273, 285 (2008) ("[C]ultures are hybrid, overlapping, and creole: forces from trade to education to migration to popular culture and transnational law ensure that all persons participate in multiple cultures at once. Cultural elements circulate globally, and they are always changing. From this point of view, 'culture' is more of a constant act of translation and re-creation or re-presentation than it is a fixed and given thing.").

Assuming that general definitional consensus could be achieved among those who advocate the inclusion of culture within the meaning of "race," and that courts were willing to adopt such a shared understanding of Title VII, that would only be the beginning of a difficult interpretive battle, and there would be other very thorny issues to confront, such as which cultural characteristics or traits to protect. *See, e.g.*, Kenji Yoshino, *Covering*, 111 YALE L. J. 769, 893 (2002) ("Even [in] . . . a culture-race analysis . . . one must still ask whether covering demands pertaining to grooming are sufficiently constitutive of race to violate bans on race discrimination."). There would also be the related question of whether cultural characteristics or traits associated with one racial group can be absorbed by or transferred to members of a different racial group. At oral argument, for example, the EEOC asserted that if a white person chose to wear dreadlocks as a

sign of racial support for her black colleagues, and the employer applied its dreadlocks ban to that person, she too could assert a race-based disparate treatment claim.

The resolution of these issues, moreover, could itself be problematic. *See* Ford, *Race as Culture*, 47 U.C.L.A. L. REV. at 1811 (explaining that recognizing a right to cultural protection under the ambit of "race" would require "courts to determine which expressions are authentic and therefore deserving of protection," and the "result will often be to discredit anyone who does not fit the culture style ascribed to her racial group"). Even if courts prove sympathetic to the "race as culture" argument, and are somehow freed from current precedent, how are they to choose among the competing definitions of "race"? How are they (and employers, for that matter) to know what cultural practices are associated with a particular "race"? And if cultural characteristics and practices are included as part of "race," is there a principled way to figure out which ones can be excluded from Title VII's protection?

We cannot, and should not, forget that we—and courts generally—are tasked with interpreting Title VII, a statute enacted by Congress, and not with grading competing doctoral theses in anthropology or sociology. Along these lines, consider the critique by Richard Ford of the attempt to have Title VII protect cultural characteristics or traits associated with race:

33

Once a status is ascribed, it is "immutable" in the pragmatic sense that the individual cannot readily alter it. This is the sense in which immutability is relevant to anti-discrimination law.

The mutability of a *racial characteristic* then, is strictly speaking, irrelevant, but not because—as difference discourse would have it—anti-discrimination law should prohibit discrimination based on mutable as well as immutable racial characteristics, but rather because racial characteristics *generally* are irrelevant. And it is quite right to say that anti-discrimination law prohibits discrimination on the basis of "immutable characteristics." But it does not follow that the immutable characteristics in question are characteristics *of race*; instead they are *any* characteristic of potential plaintiffs that may be proxies for racial status.

This cuts against some common locutions that the law prohibits discrimination against racial groups; that it prohibits discrimination on the basis of racial characteristics; that it protects racial minorities; worst of all that it "protects race." On my formulation it does none of these. Indeed it could not do these things because to do them it would first require a definition of a racial group, racial characteristic, and/or race—none of which courts have readily [at] hand. Instead, law prohibits discrimination on the basis of race—something it can do without knowing what race is and indeed without accepting that race is something that is knowable. To prohibit discrimination on the basis of race, we need only know that there is a set of ideas about race that many people accept and decide to prohibit them from acting on the basis of these ideas.

Richard Ford, RACIAL CULTURE: A CRITIQUE 103 (2005).

Our point is not to take a stand on any side of this debate—we are, after all, bound by *Willingham* and *Garcia*—but rather to suggest that, given the role and

34

complexity of race in our society, and the many different voices in the discussion, it may not be a bad idea to try to resolve through the democratic process what "race" means (or should mean) in Title VII. *Cf.* Juan F. Perea, *Ethnicity and Prejudice: Reevaluating 'National Origin' Discrimination under Title VII*, 35 WM. & MARY L. REV. 805, 861 (1994) (proposing that Congress amend Title VII to protect against discrimination based on ethnic traits).[6]

## V

Ms. Jones told CMS that she would not cut her dreadlocks in order to secure a job, and we respect that intensely personal decision and all it entails. But, for the reasons we have set out, the EEOC's original and proposed amended complaint did not state a plausible claim that CMS intentionally discriminated against Ms. Jones because of her race. The district court therefore did not err in dismissing the original complaint and in concluding that the proposed amended complaint was futile.

**AFFIRMED.**

---

[6] Religion is, of course, different from race in many ways, but it bears noting that Congress amended Title VII in 1972 to expand protection for "religious observance and practice." *See* 42 U.S.C. § 2000e(j); *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2034 (2015). It has not, however, prohibited discrimination on the basis of cultural practices associated with race.

35