JORDAN, Circuit Judge, concurring in the denial of rehearing en banc: Catastrophe Management Solutions does not hire anyone, black or white, who uses an “excessive hairstyle! ],” a category that includes dreadlocks. So when Chastity Jones, a black woman, refused to remove her dreadlocks,’ CMS rescinded her employment offer. The EEOC sued on her behalf, claiming that “[a] prohibition of dreadlocks in the workplace constitutes race discrimination because dreadlocks are a manner of wearing the hair that is physiologically and culturally associated with people of African descent.” D.E. 21-1 at ¶ 28 (EEOC’s proposed amended complaint). The EEOC’s lawsuit, in other words, sought to expand the definition of “race”—a term undefined in Title VII—to include anything purportedly associated with the culture of a protected group. The district court dismissed the case, and a panel of this court affirmed because the EEOC’s complaint did not allege—as required by our Title VII disparate-treatment precedent—that dreadlocks are, an immutable characteristic of black individuals. See Equal Employment Opportunity Comm’n v. Catastrophe Mgmt. Sols., 852 F.3d 1018, 1021, 1028-30 (11th Cir. 2016) (applying Willingham v. Macon Tel. Publ’g Co., 507 F.2d 1084 (5th Cir. 1975) (en banc), and Garcia v. Gloor, 618 F.2d 264 (5th Cir. 1980)). A .majority of this court has declined to rehear the case en banc, prompting Judge Martin to dissent from the denial of rehearing with a thoughtful critique of the panel opinion. But as insightful as Judge Martin’s dissent is, and as difficult as the issues presented are,, dismissing the complaint was the correct legal call. Under-our precedent, banning dreadlocks .in the workplace under a race-neutral grooming policy—without moi’e—does not constitute intentional race-based discrimination. First, dreadlocks are not, according to the EEOC’s proposed amended complaint, an immutable characteristic of black individuals. Second, the allegations in the complaint do not lend themselves to a reasonable inference that, in applying its grooming policy to dreadlocks, .CMS discriminated against Ms. Jones because of her race. ⅜ ⅝ ⅜ ⅜ To start, I think Judge Martin overstates what the Supreme Court held, hi Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). She says that a majority of the Court .in Price Waterhouse allowed the plaintiff to claim disparate treatment for behavior she could, have changed. And that, she contends, cannot be squared with Willingham and its immutability requirement. Her argument draws exclusively from the four-justice plurality opinion, which she says constitutes the holding of the case because Justice White and Justice O'Connor, each of whom concurred in the judgment, did not dispute the plurality’s rationale. Assuming that is the correct reading of the concurring opinions, I believe Price Waterhouse and our decision in Willingham can be reconciled because the Price Waterhouse plurality did not hold that Title VJI protects mutable characteristics. In Price Waterhouse, Ann Hopkins, a woman, sued for sex discrimination when she was denied partnership’ at a well-known accounting firm. Although there was evidence that the firm’s partners had disparaged Ms. Hopkins’ demeanor as insufficiently feminine, Price Waterhouse seemed to argue on appeal that such comments were irrelevant for Title VII purposes. See Price Waterhouse, 490 U.S. at 250-51, 109 S.Ct. 1775. The plurality rejected that argument, explaining that while stereotyped remarks did not “inevitably prove” a disparate-treatment claim, they could “certainly be evidence” that, the firm “actually relied on [Ms. Hopkins’] gender in making its [employment] decision,” in violation of Title VII. See id. at 251, 109 S.Ct. 1775 (emphasis in original). Put differently, the Price Waterhouse plurality made the unremarkable observation that, when an employer makes a decision based on a mutable characteristic (demeanor) that is linked by stereotype (how women should behave) to one of Title VII’s protected categories (a person’s sex), the decision may be impermissibly based on •the protected category, so the attack on the mutable characteristic is legally relevant to the disparate-treatment claim. But a plaintiff must still ground her disparate-treatment claim on one of the protected Title VII categories, which Willingham tells us are immutable. In my view, Price Waterhouse did not elevate mutable features, independent of a protected category, to protected status. See Jespersen v. Harrah’s Operating Co., 444 F.3d 1104, 1111 (9th Cir. 2006) (en banc) (interpreting Price Waterhouse as a mixed-motive discrimination case in which the Supreme Court clarified that stereotypes can serve as evidence that an employer unlawfully considered sex in making an employment decision); Chapman v. AI Transp., 229 F.3d 1012, 1036 (11th Cir. 2000) (en banc) (distinguishing between a mutable trait and an “impermissible consideration”—that is, a protected category). And because it did not, merely prohibiting a mutable characteristic does not, as Judge Martin and the EEOC argue, constitute discrimination. Title VII, the Supreme Court has told us, is not “a. general civility code for the American workplace.” Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). It requires courts to determine whether a particular policy is discriminatory, but not whether it.is ideal or fair. The panel here was not tasked with addressing whether CMS’ grooming policy is enlightened, or whether it makes sense in our multicultural and evolving society. The panel decided only whether the EEOC sufficiently alleged a Title VII disparate-treatment .claim under Supreme Court and Eleventh Circuit precedent. * * ⅜ # ⅜ Judge Martin takes aim at a purported internal consistency in the panel opinion, arguing that, if immutability is the rule, the panel provided two different, conflicting definitions of the term. The first is that an immutable trait is something “beyond the victim’s power to alter,” a phrase the panel quoted from the binding Former Fifth Circuit decision in Garcia. Judge Martin- maintains that this definition is inconsistent with the panel’s- reliance ■ on Jenkins v. Blue Cross Mut. Hosp. Ins., Inc., 538 F.2d 164 (7th Cir. 1976) (en banc), which recognized a race-discrimination claim for .a black plaintiff who alleged she was denied promotion for wearing an afro, because both .afros and dreadlocks can be altered. Given this supposed inconsistency,. Judge Martin’ concludes that the panel actually defined immutable as “naturally occurring,” and argues that the complaint sufficiently alleged that .dreadlocks occur naturally in black individuals’ hair. The panel opinion isn’t as confusing as Judge Martin makes it seem. The two definitions provided are not at. odds because the panel used the phrase “beyond the victim’s power to alter” to refer to a trait that a person cannot change permanently because it is present from birth. See The American Heritage Dictionary op the English Language 878 (4th ed. 2009) (defining “immutable” as “[n]ot subject or susceptible to change”). The opinion, in so many words, made this abundantly clear. See, e.g., Catastrophe Mgmt., 852 F.3d at 1026-27. This is also what courts after Willingham, have understood immutability to mean. See, e.g., Earwood v. Cont’l Se. Lines, Inc., 539 F.2d 1349, 1351 (4th Cir. 1976) (following Willingham and explaining that “discrimination based on ... immutable sex characteristics ... violatefs] [Title VII] because they present obstacles to employment of one sex that cannot be overcome”) (emphasis added). Indeed, when the Former Fifth Circuit in Garcia employed the phrase, jt gave as examples a person’s “place, of birth” and “the place of birth of his forebears.” See Garcia, 618 F.2d at 269. Judge Martin’s critique of the panel opinion conflates altering a characteristic with masking it. Those two concepts are distinct; if a trait can be masked momentarily but will eventually revert to its natural state, it is immutable because it is “beyond the [person’s] power ■ to alter.” According to Judge Martin, the panel also differentihted between dreadlocks and afros based on “its own notion that the only natural black hair is an [a]fro.” The panel, however, accepted that an afro was the natural state of Ms. Jenkins’ hair because Ms. Jenkins said it was. Ms. Jenkins had alleged that, after years of manipulating her hair into different styles, she suffered racial discrimination only when she allowed her hair to revert to its “natural ... style”—an afro. See Jenkins, 538 F.2d at 167 (emphasis added). Here the EEOC presented a completely different theory of discrimination in its proposed amended complaint. It asserted that dreadlocks are protected under Title VII because they are culturally and physiologically associated with individuals of African descent. Even if this somehow does not constitute abandonment of the argument that dreadlocks are an immutable characteristic of black individuals, the complaint failed to assert that dreadlocks are a black individual’s hair in its natural, unmediated state. ***** Judge Martin cites to portions of the complaint she believes alleged that dreadlocks occur naturally. But when read in context, the allegations Judge Martin cites to do not support her position. The complaint’s thesis is that dreadlocks are a hairstyle that is suitable for black individuals’ hair, and the snippets she selects are not to the contrary. See, e.g., D.E. 21-1 at ¶ 19, 26, 28. For example, one of the allegations Judge Martin cites is that “[d]readlocks are formed in a [b]lack person’s hair naturally, without any manipulation.” Id. at ¶ 19. This phrase, however, comes after the introductory sentence of that paragraph, which states that “[d]readlocks [are] a manner of wearing hair that is common for [b]laek people and suitable for [b]lack hair texture,” and is followed by an acknowledgment that dreadlocks can be formed “by the manual manipulation of hair into larger coils of hair.” Id. Indeed, the complaint’s references to the “natural texture” of black individuals’ hair, id. at ¶ 27, which “naturally grows in very tight coarse coils,” id. at ¶ 22, are assertions embedded in a section of the complaint dedicated to explaining the uniqueness of black hair and the challenges black individuals face when it comes to their hair styling choices. See id. at ¶ 22-27. That section of the complaint reiterates that “dreadlocks are a method of hair styling suitable for the texture of black hair and culturally associated with [b]lack people.” See id. at ¶ 26. Finally, the complaint’s description of dreadlocks as “physiologically and culturally associated with people of African descent,” id. at ¶ 28,- is similarly followed by the statement that dreadlocks are “a manner of wearing hair that is suitable to the texture of [b]lack hair.” Id. In sum, the allegations cited by Judge Martin do not support the claim that dreadlocks are naturally occurring. To the contrary, the complaint faithfully reflects the overarching theme of the EEOC’s Title VII theory—that dreadlocks are a protected cultural choice—and it was on that theory that the panel resolved the case. ⅝ # ¾; ⅝ * Judge Martin contends that, even if banning dreadlocks isn’t per se race discrimination, the . complaint plausibly stated that QMS used dreadlocks as a pretext for not hiring Ms. Jones on account of her race. Analogizing to Price Waterhouse, she argues that a ban on dreadlocks is a proxy for not employing black individuals because the two, according to the complaint, are associated by a stereotype that black individuals’ hair is unprofessional. This case, however, is very different from Price Waterhouse. In Price Water-house, Ms. Hopkins plausibly stated a claim of intentional sex discrimination because the firm’s partners had, on multiple occasions, made it clear that their primary grievance—what they described as Ms. Hopkins’ “over[ ] aggressiveness]” and “macho” demeanor—was that a woman was displaying traits stereotypically associated with men. See Price Waterhouse, 490 U.S. at 235, 109 S.Ct. 1775. They were not shy about it either; one partner even admitted that the other partners only objected to Ms. Hopkins’ prodigious swearing “because it’s a lady using foul language.” Id. CMS’ prohibition against dreadlocks, by contrast, is based on a race-neutral policy that applies with equal force to men and women (and hairstyles) of all races. So, unlike the situation in Price Waterhouse, the policy agaihst the allegedly stereotypical characteristic (dreadlocks) is unmoored from the protected category (Ms. Jones’ race). See Brown v. D.C. Transit Sys., Inc., 523 F.2d 725, 728 (D.C. Cir. 1975) (holding that, unless there is evidence of pretext or bad faith, “[t]he wearing of a uniform, the type of uniform, the requirement of hirsute conformity applicable to whites and blacks alike, are simply nondiscriminatory conditions of employment”) (emphasis added). See also Jespersen, 444 F.3d at 1111 (holding that gender-based grooming policy did not constitute “[i]m-permissible sex stereotyping” in part because comparable grooming requirements applied equally to all employees, “male and female”). And although the complaint alleged that black individuals wear dreadlocks more often than persons of other racial groups, that assertion makes more sense in the context of a disparate-impact claim, which considers whether one group of people is disproportionately affected by a facially-neutral policy. But that theory of Title VII liability is not at issue here because the EEOC declined to pursue it. ⅝ ⅝{ ⅜? ⅜ ⅝ The EEOC brought this case on behalf of Ms. Jones in the hopes that we would do what neither it (through its rulemaking authority), nor Congress, nor any other court has done: update the meaning of race in Title VII to reflect its increasingly nebulous (and disputed) boundaries. But there is no legal or factual agreement on where those boundaries lie, and Judge Martin and the EEOC do not pretend otherwise. Debates rage in the academy (as well as in society) over whether race is biological, cultural, consensus-based, or some or none of the above; over who gets to make the call about the meaning of rac.e; and over how concepts associated with race (including cultural traits) are treated. See Catastrophe Mgmt., 852 F.3d at 1033-34 (collecting some of the literature). There is even disagreement over whether dreadlocká .are . exclusively (or even primarily) of African descent. See Bert Ashe, Twisted: My Dreadlocic Chronicles 36 (2015) (“The first written evidence of dreadlocks is in the Vedic scriptures, which are of Indian origin[,] ,,, [and] were developed and written about 2,500 years ago[.]”). As far as I can tell, the position advocated by the EEOC could reduce the concept of race in Title VII to little more than subjective notions of cultural appropriation, See Initial Br. of EEOC at 35-37 (arguing that Title VII, shields symbols of racial pride, as defined by the user). Perhaps this, view reflects the future-of Title VII, but if so, Congress is, the proper entity through which to effect such significant change. : For. the time being, we are left with Supreme Court precedent explaining that discrimination based on stereotypes is circumstantial evidence of discrimination on the basis of a protected category, and with circuit precedent telling us that protected categories and characteristics must be immutable. Those two lines of authority, in my opinion, are not mutually exclusive.