IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-13482

_____

D.C. Docket No. 1:13-cv-00476-CB-M


EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

                                        Plaintiff - Appellant,

versus

CATASTROPHE MANAGEMENT SOLUTIONS,

                                        Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____


Before ED CARNES, Chief Judge, TJOFLAT, HULL, MARCUS, WILSON, WILLIAM PRYOR, MARTIN, JORDAN, ROSENBAUM, JULIE CARNES, and JILL PRYOR, Circuit Judges.[*]

---

[*] Judge Kevin C. Newsom, who joined the Court on August 4, 2017, did not participate in the en banc poll that was conducted in this case.

BY THE COURT:

A petition for rehearing having been filed and a member of this Court in active service having requested a poll on whether this case should be reheard by the Court sitting en banc, and a majority of the judges in active service on this Court having voted against granting a rehearing en banc, it is ORDERED that this case will not be reheard en banc.

JORDAN, Circuit Judge, concurring in the denial of rehearing en banc:

Catastrophe Management Solutions does not hire anyone, black or white, who uses an "excessive hairstyle[ ]," a category that includes dreadlocks. So when Chastity Jones, a black woman, refused to remove her dreadlocks, CMS rescinded her employment offer. The EEOC sued on her behalf, claiming that "[a] prohibition of dreadlocks in the workplace constitutes race discrimination because dreadlocks are a manner of wearing the hair that is physiologically and culturally associated with people of African descent." D.E. 21-1 at ¶ 28 (EEOC's proposed amended complaint). The EEOC's lawsuit, in other words, sought to expand the definition of "race"—a term undefined in Title VII—to include anything purportedly associated with the culture of a protected group.

The district court dismissed the case, and a panel of this court affirmed because the EEOC's complaint did not allege—as required by our Title VII disparate-treatment precedent—that dreadlocks are an immutable characteristic of black individuals. *See Equal Employment Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1021, 1028–30 (11th Cir. 2016) (applying *Willingham v. Macon Tel. Publ'g Co.*, 507 F.2d 1084 (5th Cir. 1975) (en banc), and *Garcia v. Gloor*, 618 F.2d 264 (5th Cir. 1980)). A majority of this court has declined to rehear the case en banc, prompting Judge Martin to dissent from the denial of rehearing with a thoughtful critique of the panel opinion.

3

But as insightful as Judge Martin's dissent is, and as difficult as the issues presented are, dismissing the complaint was the correct legal call.  Under our precedent, banning dreadlocks in the workplace under a race-neutral grooming policy—without more—does not constitute intentional race-based discrimination. First, dreadlocks are not, according to the EEOC's proposed amended complaint, an immutable characteristic of black individuals.  Second, the allegations in the complaint do not lend themselves to a reasonable inference that, in applying its grooming policy to dreadlocks, CMS discriminated against Ms. Jones because of her race.

\* \* \* \* \*

To start, I think Judge Martin overstates what the Supreme Court held in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).  She says that a majority of the Court in *Price Waterhouse* allowed the plaintiff to claim disparate treatment for behavior she could have changed.  And that, she contends, cannot be squared with *Willingham* and its immutability requirement.  Her argument draws exclusively from the four-justice plurality opinion, which she says constitutes the holding of the case because Justice White and Justice O'Connor, each of whom concurred in the judgment, did not dispute the plurality's rationale.  Assuming that is the correct reading of the concurring opinions, I believe *Price Waterhouse* and our decision in

4

*Willingham* can be reconciled because the *Price Waterhouse* plurality did not hold that Title VII protects mutable characteristics.

In *Price Waterhouse*, Ann Hopkins, a woman, sued for sex discrimination when she was denied partnership at a well-known accounting firm.  Although there was evidence that the firm's partners had disparaged Ms. Hopkins' demeanor as insufficiently feminine, Price Waterhouse seemed to argue on appeal that such comments were irrelevant for Title VII purposes.  *See Price Waterhouse*, 490 U.S. at 250–51.  The plurality rejected that argument, explaining that while stereotyped remarks did not "inevitably prove" a disparate-treatment claim, they could "certainly be *evidence*" that the firm "actually relied on [Ms. Hopkins'] gender in making its [employment] decision," in violation of Title VII.  *See id.* at 251 (emphasis in original).

Put differently, the *Price Waterhouse* plurality made the unremarkable observation that, when an employer makes a decision based on a mutable characteristic (demeanor) that is linked by stereotype (how women should behave) to one of Title VII's protected categories (a person's sex), the decision may be impermissibly based on the protected category, so the attack on the mutable characteristic is legally relevant to the disparate-treatment claim.  But a plaintiff must still ground her disparate-treatment claim on one of the protected Title VII categories, which *Willingham* tells us are immutable.

5

In my view, *Price Waterhouse* did not elevate mutable features, independent of a protected category, to protected status. *See Jespersen v. Harrah's Operating Co.*, 444 F.3d 1104, 1111 (9th Cir. 2006) (en banc) (interpreting *Price Waterhouse* as a mixed-motive discrimination case in which the Supreme Court clarified that stereotypes can serve as evidence that an employer unlawfully considered sex in making an employment decision); *Chapman v. AI Transp.*, 229 F.3d 1012, 1036 (11th Cir. 2000) (en banc) (distinguishing between a mutable trait and an "impermissible consideration"—that is, a protected category). And because it did not, merely prohibiting a mutable characteristic does not, as Judge Martin and the EEOC argue, constitute discrimination.

Title VII, the Supreme Court has told us, is not "a general civility code for the American workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). It requires courts to determine whether a particular policy is discriminatory, but not whether it is ideal or fair. The panel here was not tasked with addressing whether CMS' grooming policy is enlightened, or whether it makes sense in our multicultural and evolving society. The panel decided only whether the EEOC sufficiently alleged a Title VII disparate-treatment claim under Supreme Court and Eleventh Circuit precedent.

6

* * * * *

Judge Martin takes aim at a purported internal consistency in the panel opinion, arguing that, if immutability is the rule, the panel provided two different, conflicting definitions of the term. The first is that an immutable trait is something "beyond the victim's power to alter," a phrase the panel quoted from the binding Former Fifth Circuit decision in *Garcia*. Judge Martin maintains that this definition is inconsistent with the panel's reliance on *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164 (7th Cir. 1976) (en banc), which recognized a race-discrimination claim for a black plaintiff who alleged she was denied promotion for wearing an afro, because both afros and dreadlocks can be altered. Given this supposed inconsistency, Judge Martin concludes that the panel actually defined immutable as "naturally occurring," and argues that the complaint sufficiently alleged that dreadlocks occur naturally in black individuals' hair.

The panel opinion isn't as confusing as Judge Martin makes it seem. The two definitions provided are not at odds because the panel used the phrase "beyond the victim's power to alter" to refer to a trait that a person cannot change permanently because it is present from birth. *See* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 878 (4th ed. 2009) (defining "immutable" as "[n]ot subject or susceptible to change"). The opinion, in so many words, made this abundantly clear. *See, e.g., Catastrophe Mgmt.*, 852 F.3d at 1026–27. This is

7

also what courts after *Willingham* have understood immutability to mean. *See, e.g., Earwood v. Cont'l Se. Lines, Inc.*, 539 F.2d 1349, 1351 (4th Cir. 1976) (following *Willingham* and explaining that "discrimination based on . . . immutable sex characteristics . . . violate[s] [Title VII] because they present obstacles to employment of one sex that *cannot be overcome*") (emphasis added). Indeed, when the Former Fifth Circuit in *Garcia* employed the phrase, it gave as examples a person's "place of birth" and "the place of birth of his forebears." *See Garcia*, 618 F.2d at 269.

Judge Martin's critique of the panel opinion conflates altering a characteristic with masking it. Those two concepts are distinct; if a trait can be masked momentarily but will eventually revert to its natural state, it is immutable because it is "beyond the [person's] power to alter."

According to Judge Martin, the panel also differentiated between dreadlocks and afros based on "its own notion that the only natural black hair is an [a]fro." The panel, however, accepted that an afro was the natural state of Ms. Jenkins' hair because Ms. Jenkins said it was. Ms. Jenkins had alleged that, after years of manipulating her hair into different styles, she suffered racial discrimination only when she allowed her hair to revert to its "*natural* . . . style"—an afro. *See Jenkins*, 538 F.2d at 167 (emphasis added).

8

Here the EEOC presented a completely different theory of discrimination in its proposed amended complaint. It asserted that dreadlocks are protected under Title VII because they are culturally and physiologically associated with individuals of African descent. Even if this somehow does not constitute abandonment of the argument that dreadlocks are an immutable characteristic of black individuals, the complaint failed to assert that dreadlocks are a black individual's hair in its natural, unmediated state.

* * * * *

Judge Martin cites to portions of the complaint she believes alleged that dreadlocks occur naturally. But when read in context, the allegations Judge Martin cites to do not support her position. The complaint's thesis is that dreadlocks are a hairstyle that is suitable for black individuals' hair, and the snippets she selects are not to the contrary. *See, e.g.,* D.E. 21-1 at ¶ 19, 26, 28.

For example, one of the allegations Judge Martin cites is that "[d]readlocks are formed in a [b]lack person's hair naturally, without any manipulation." *Id.* at ¶ 19. This phrase, however, comes after the introductory sentence of that paragraph, which states that "[d]readlocks [are] a manner of wearing hair that is common for [b]lack people and suitable for [b]lack hair texture," and is followed by an acknowledgment that dreadlocks can be formed "by the manual manipulation of hair into larger coils of hair." *Id.* Indeed, the complaint's

9

references to the "natural texture" of black individuals' hair, *id.* at ¶ 27, which "naturally grows in very tight coarse coils," *id.* at ¶ 22, are assertions embedded in a section of the complaint dedicated to explaining the uniqueness of black hair and the challenges black individuals face when it comes to their hair styling choices. *See id.* at ¶ 22–27. That section of the complaint reiterates that "dreadlocks are a method of hair styling suitable for the texture of black hair and culturally associated with [b]lack people." *See id.* at ¶ 26. Finally, the complaint's description of dreadlocks as "physiologically and culturally associated with people of African descent," *id.* at ¶ 28, is similarly followed by the statement that dreadlocks are "a manner of wearing hair that is suitable to the texture of [b]lack hair." *Id.*

In sum, the allegations cited by Judge Martin do not support the claim that dreadlocks are naturally occurring. To the contrary, the complaint faithfully reflects the overarching theme of the EEOC's Title VII theory—that dreadlocks are a protected cultural choice—and it was on that theory that the panel resolved the case.

\* \* \* \* \*

Judge Martin contends that, even if banning dreadlocks isn't *per se* race discrimination, the complaint plausibly stated that CMS used dreadlocks as a pretext for not hiring Ms. Jones on account of her race. Analogizing to *Price*

10

*Waterhouse*, she argues that a ban on dreadlocks is a proxy for not employing black individuals because the two, according to the complaint, are associated by a stereotype that black individuals' hair is unprofessional.

This case, however, is very different from *Price Waterhouse*.  In *Price Waterhouse*, Ms. Hopkins plausibly stated a claim of intentional sex discrimination because the firm's partners had, on multiple occasions, made it clear that their primary grievance—what they described as Ms. Hopkins' "over[ ] aggressive[ness]" and "macho" demeanor—was that a *woman* was displaying traits stereotypically associated with men.  *See Price Waterhouse*, 490 U.S. at 235.  They were not shy about it either; one partner even admitted that the other partners only objected to Ms. Hopkins' prodigious swearing "because it's a lady using foul language." *Id*.

CMS' prohibition against dreadlocks, by contrast, is based on a race-neutral policy that applies with equal force to men and women (and hairstyles) of all races. So, unlike the situation in *Price Waterhouse*, the policy against the allegedly stereotypical characteristic (dreadlocks) is unmoored from the protected category (Ms. Jones' race).  *See Brown v. D.C. Transit Sys., Inc.*, 523 F.2d 725, 728 (D.C. Cir. 1975) (holding that, unless there is evidence of pretext or bad faith, "[t]he wearing of a uniform, the type of uniform, the requirement of hirsute conformity *applicable to whites and blacks alike*, are simply non-discriminatory conditions of

11

employment") (emphasis added).  *See also Jespersen*, 444 F.3d at 1111 (holding that gender-based grooming policy did not constitute "[i]mpermissible sex stereotyping" in part because comparable grooming requirements applied equally to all employees, "male and female").  And although the complaint alleged that black individuals wear dreadlocks more often than persons of other racial groups, that assertion makes more sense in the context of a disparate-impact claim, which considers whether one group of people is disproportionately affected by a facially-neutral policy.  But that theory of Title VII liability is not at issue here because the EEOC declined to pursue it.

* * * * *

The EEOC brought this case on behalf of Ms. Jones in the hopes that we would do what neither it (through its rulemaking authority), nor Congress, nor any other court has done: update the meaning of race in Title VII to reflect its increasingly nebulous (and disputed) boundaries.  But there is no legal or factual agreement on where those boundaries lie, and Judge Martin and the EEOC do not pretend otherwise.  Debates rage in the academy (as well as in society) over whether race is biological, cultural, consensus-based, or some or none of the above; over who gets to make the call about the meaning of race; and over how concepts associated with race (including cultural traits) are treated.  *See Catastrophe Mgmt.*, 852 F.3d at 1033–34 (collecting some of the literature).  There

12

is even disagreement over whether dreadlocks are exclusively (or even primarily) of African descent.  *See* BERT ASHE, TWISTED: MY DREADLOCK CHRONICLES 36 (2015) ("The first written evidence of dreadlocks is in the Vedic scriptures, which are of Indian origin[,] . . . [and] were developed and written about 2,500 years ago[.]").

As far as I can tell, the position advocated by the EEOC could reduce the concept of race in Title VII to little more than subjective notions of cultural appropriation.  *See* Initial Br. of EEOC at 35–37 (arguing that Title VII shields symbols of racial pride, as defined by the user).  Perhaps this view reflects the future of Title VII, but if so, Congress is the proper entity through which to effect such significant change.

For the time being, we are left with Supreme Court precedent explaining that discrimination based on stereotypes is circumstantial evidence of discrimination on the basis of a protected category, and with circuit precedent telling us that protected categories and characteristics must be immutable.  Those two lines of authority, in my opinion, are not mutually exclusive.

13

MARTIN, Circuit Judge, with whom ROSENBAUM and JILL PRYOR, Circuit Judges join, dissenting from the denial of rehearing en banc:

Chastity Jones, a black woman, applied for a position at Catastrophe Management Solutions ("CMS"). She got the job. But after she was hired, the human resources manager—who is white—told Ms. Jones the company had to rescind its job offer because she wore her hair in dreadlocks. The manager told Ms. Jones the problem with dreadlocks is "they tend to get messy," but at the same time recognized that Ms. Jones's own dreadlocks were not messy. Even so, CMS took away Ms. Jones's job offer because her hair violated the company's blanket ban on dreadlocks.

The Equal Employment Opportunity Commission ("EEOC") filed suit against CMS on behalf of Ms. Jones. The complaint alleged that CMS discriminated against Ms. Jones on the basis of her race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2. The complaint alleged that dreadlocks are black hair in its natural, unmanipulated state, and that the natural texture of black hair carries with it a deeply entrenched racial stereotype that sees black people as "unprofessional," "extreme," and "not neat." The complaint also alleged that CMS's stated reason for banning dreadlocks—"they tend to get messy"—did not apply to Ms. Jones, as the human resources manager acknowledged Ms. Jones's hair was not messy. Thus, the complaint indicated that CMS's only reason for refusing to hire Ms. Jones was the false racial stereotype.

14

Even with these clear allegations of racial discrimination, the District Court dismissed this action based on the pleadings alone. See Equal Emp't Opportunity Comm'n v. Catastrophe Mgmt. Sols., 852 F.3d 1018, 1021 (11th Cir. 2016). This means, of course, that the courthouse doors were closed to Ms. Jones without either she or CMS having any opportunity for factual exploration or development of her claims. On this limited record, then, a panel of this Court affirmed. And now, despite the startling nature of the precedent created by the panel opinion, a majority of this Court has voted not to rehear the case en banc. I dissent from that decision.

The panel held that the complaint failed to state a claim because Title VII prohibits only discrimination based on "immutable traits" and dreadlocks are not "an immutable characteristic of black persons." Id. at 1021. The panel said our decision in Willingham v. Macon Tel. Publ'g Co., 507 F.2d 1084 (5th Cir. 1975) (en banc),[1] dictates this conclusion. See Catastrophe Mgmt., 852 F.3d at 1028–30. I cannot agree. By resting its decision on Willingham's mutable/immutable distinction, the panel revives—in fact, expands—a doctrine the Supreme Court invalidated more than twenty-five years ago in Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S. Ct. 1775 (1989). Even if Willingham's immutable-trait

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Id. at 1209.

15

requirement survived <u>Price Waterhouse</u>, the allegations the EEOC made here on behalf of Ms. Jones are sufficient to satisfy that requirement and state a Title VII disparate treatment claim.

## I.  BACKGROUND

In May 2010, Ms. Jones applied to be a customer service representative at CMS, a claims-processing company in Mobile, Alabama.  <u>Catastrophe Mgmt.</u>, 852 F.3d at 1021.  The position did not involve any in-person contact with customers. It called for speaking with customers only over the phone, from a large call center. <u>Id.</u>  Ms. Jones was selected for an in-person interview.  <u>Id.</u>  She arrived at CMS a few days later dressed in a business suit.  <u>Id.</u>  She wore her hair in short dreadlocks.  <u>Id.</u>

First, Ms. Jones interviewed one-on-one with a CMS "trainer."  The trainer made no mention of her hair, nor did any other CMS employee who saw Ms. Jones.  After her interview, CMS's human resources manager Jeannie Wilson, a white woman, informed Ms. Jones and a number of other applicants they had been hired.  <u>Id.</u>  Ms. Wilson explained that they would need to complete scheduled lab tests and paperwork before beginning employment.  <u>Id.</u>  Ms. Wilson offered to meet privately with anyone who had a conflict with the time set for the tests.  <u>Id.</u>

After the group meeting, Ms. Jones met privately with Ms. Wilson to talk about a scheduling conflict and request a different date for her lab tests.  <u>Id.</u>  Ms.

16

Wilson told Ms. Jones she could come back to complete the lab work at another time. Id.

Ms. Jones was about to leave when Ms. Wilson asked her whether her hair was in "dreadlocks." Id. Ms. Jones said yes, and Ms. Wilson replied that CMS could not hire her with dreadlocks. Id. When Ms. Jones asked why her dreadlocks would be a problem, Ms. Wilson said: "[T]hey tend to get messy, although I'm not saying yours are, but you know what I'm talking about." Id. Ms. Jones then told Ms. Wilson she would not cut her hair off. Id. at 1022. Ms. Wilson responded that CMS could no longer hire her. Id.

At the time, CMS had a written policy that said: "All personnel are expected to be dressed and groomed in a manner that projects a professional and businesslike image while adhering to company and industry standards and/or guidelines. . . . [H]airstyle should reflect a business/professional image. No excessive hairstyles or unusual colors are acceptable[.]" Id. It had no formal, written policy about dreadlocks. Judge Jordan says CMS "does not hire anyone, black or white, who uses an 'excessive hairstyle [],'" a category that includes dreadlocks." This is surmise on Judge Jordan's part. Because Ms. Jones's case was dismissed based on the face of her pleadings, the record before this Court is devoid of any evidence about how CMS has ever applied its hair policy to anyone who is not black.

17

## II. DISCUSSION

The panel concluded that our previous decision in Willingham required it to affirm the dismissal of Ms. Jones's disparate treatment claim. See Catastrophe Mgmt., 852 F.3d at 1028–30. Willingham addressed an employer policy that required male employees to keep their hair shorter than shoulder length but allowed female employees to wear their hair any length. 507 F.2d at 1087–88. The employer adopted the requirement to avoid the association between "long hair on men [and] the counter-culture types." Id. at 1087. The plaintiff was a man who had been denied a position because his hair was too long. Id. He brought a Title VII claim alleging that this policy discriminated on the basis of his sex. Id. at 1086. The former Fifth Circuit rejected his claim. It "adopt[ed] the view . . . that distinctions in employment practices between men and women on the basis of something other than immutable or protected characteristics do not inhibit employment opportunity in violation of [Title VII]." Id. at 1092. Because "[h]air length is not immutable," the Willingham court reasoned, the plaintiff had no claim. Id. at 1091–92.

The panel in Ms. Jones's case reads Willingham to establish a general rule that Title VII protects against discrimination only if that "discrimination [is] based on immutable characteristics." Catastrophe Mgmt., 852 F.3d at 1028. Her panel then applied this "immutable/mutable distinction" to the EEOC's complaint. Id. at

18

1030.  Because the "complaint did not allege that dreadlocks are an immutable characteristic of black persons," the panel reasoned, the complaint failed to state a claim under Title VII.  Id. at 1022; see also id. at 1030.  In reaching this conclusion, the panel decided that dreadlocks are merely a "cultural practice[]," id. at 1030, and are not "beyond the [plaintiff's] power to alter."  Id. at 1029 (quoting Garcia v. Gloor, 618 F.2d 264, 269 (5th Cir. 1980)).  So, since Ms. Jones could "alter" her dreadlocks, she failed to get past Willingham's "immutable characteristic limitation."  Id.

### A.

Willingham's immutable-trait requirement is no longer good law, and Ms. Jones's panel was wrong to invoke it.  The Supreme Court's 1989 decision in Price Waterhouse made clear that Title VII's prohibition against discrimination on the basis of a statutorily protected class is not limited to protecting only those characteristics of the class that may be deemed "immutable."  Because Price Waterhouse undermined Willingham's immutable-trait requirement "to the point of abrogation," the panel should not have relied on it to dismiss Ms. Jones's claim.  See Chambers v. Thompson, 150 F.3d 1324, 1326 (11th Cir. 1998).

Price Waterhouse addressed sex discrimination.  Ann Hopkins alleged that her employer, the accounting firm Price Waterhouse, refused to allow her to become a partner in the firm because her gender presentation defied the firm's

19

view of how a woman should look and act.  One partner described her as "macho."

Price Waterhouse, 490 U.S. at 235, 109 S. Ct. at 1782 (plurality opinion).  Another

advised her to take "a course at charm school."  Id.  But the "coup de grace," to use

the Supreme Court's term, came from a partner who told Ms. Hopkins she needed

to "walk more femininely, talk more femininely, dress more femininely, wear

make-up, have her hair styled, and wear jewelry."  Id. (emphasis omitted).

The Supreme Court held that these comments showed Price Waterhouse

discriminated against Ms. Hopkins on the basis of her sex in violation of Title VII.[2]

Id. at 250–51, 109 S. Ct. at 1790–91; id. at 258–61, 109 S. Ct. 1795–96 (White, J.,

concurring); id. at 272–73, 109 S. Ct. 1802–03 (O'Connor, J., concurring).  None

of the traits the employer identified as its reasons for not promoting Ms. Hopkins

were immutable.  Nonetheless, the Supreme Court held that discrimination on the

basis of these traits, which Ms. Hopkins could but did not change, constituted sex

discrimination.  The Court explained that discrimination on the basis of these

mutable characteristics—how a woman talks, dresses, or styles her hair—showed

discrimination on the basis of sex.  In asking Ms. Hopkins to make these aspects of

---

[2] Although there was no majority opinion in Price Waterhouse, I refer to this as the holding of
the Court because it was the opinion of the four-justice plurality decision, and neither Justice
White nor Justice O'Connor, each of whom concurred in the judgment, had any quarrel with it.
See Marks v. United States, 430 U.S. 188, 193, 97 S. Ct. 990, 993 (1977) ("When a fragmented
Court decides a case and no single rationale explaining the result enjoys the assent of five
Justices, the holding of the Court may be viewed as that position taken by those Members who
concurred in the judgments on the narrowest grounds." (quotation omitted and alteration
adopted)).

her "deportment" more feminine, Price Waterhouse required her to conform to "the stereotype associated with" her sex. Id. at 251, 256, 109 S. Ct. at 1791, 1794. The Supreme Court declared:

> [W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for in forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.

Id. at 251, 109 S. Ct. at 1791 (quotation omitted and alteration adopted). Since this declaration from the Supreme Court, our Court has repeatedly recognized that "discrimination on the basis of gender stereotype is sex-based discrimination." Glenn v. Brumby, 663 F.3d 1312, 1316 (11th Cir. 2011); see Evans v. Ga. Reg'l Hosp., 850 F.3d 1248, 1254 (11th Cir. 2017) (same); see also Equal Emp't Opportunity Comm'n v. Boh Bros. Const. Co., 731 F.3d 444, 454 & n.4 (5th Cir. 2013) (collecting cases of the other circuits stating the same conclusion).

The lesson of Price Waterhouse is clear. An employment decision based on a stereotype associated with the employee's protected class may be disparate treatment under Title VII even when the stereotyped trait is not an "immutable" biological characteristic of the employee. As this Court has recognized, "Title VII bar[s] not just discrimination because of biological sex, but also gender stereotyping—failing to act and appear according to expectations defined by gender." Glenn, 663 F.3d at 1316 (emphasis added); see also Evans, 850 F.3d at

21

1260 (William Pryor, J., concurring) (stating that Price Waterhouse "concerned claims that an employee's behavior . . . deviated from a gender stereotype held by an employer" and that "[t]he doctrine of gender nonconformity is, and always has been, behavior based").

Thus, after Price Waterhouse, Title VII's protections clearly extend beyond Willingham's requirement that a plaintiff show discrimination based on an immutable trait. In Willingham, the plaintiff, who was denied employment solely because he did not have the short haircut required of male employees, argued that "since short hair is stereotypically male, requiring it of all male applicants violates [Title VII]." 507 F.2d at 1089. Mr. Willingham raised the gender-stereotyping argument, so the court necessarily and expressly considered whether "sexual stereotypes violate [Title VII]." Id. at 1090. Our court concluded they do not. See id. at 1092–93. In rejecting the gender-stereotyping theory of liability, the Willingham court held that the "objective" of "eliminating sexual stereotypes . . . . may not be read into the Civil Rights Act of 1964 without further Congressional action." Id. at 1092. "Congress," the court reasoned, "did not intend for its proscription of sexual discrimination to have [such] significant and sweeping implications." Id. at 1090. But of course this is precisely what the Supreme Court in Price Waterhouse told us Congress intended. See Price Waterhouse, 490 U.S. at 251, 109 S. Ct. at 1791 ("Congress intended to strike at the entire spectrum of

22

disparate treatment of men and women resulting from sex stereotypes."). Commentators have long noted that this Court's decision in <u>Willingham</u> "predate[s] the Supreme Court's more expansive prohibitions of sexual stereotyping [in <u>Price Waterhouse</u>] and thus relied on reasoning that is no longer good law."  Mary Anne C. Case, <u>Disaggregating Gender from Sex and Sexual Orientation: The Effeminate Man in the Law and Feminist Jurisprudence</u>, 105 Yale L.J. 1, 61 (1995); <u>see also</u> Robert Post, <u>Prejudicial Appearances: The Logic of American Antidiscrimination Law</u>, 88 Cal. L. Rev. 1, 35–36 & n.166 (2000) (explaining that in the face of <u>Price Waterhouse</u>, <u>Willingham</u> and other cases upholding sex-differentiated grooming codes present a "spectacle of preposterous doctrinal formulations").

When a "direct[] conflict" like this arises between our prior precedent and a later decision of the Supreme Court, it is our obligation to leave our precedent behind and respect the Supreme Court's pronouncement.  <u>See</u> <u>United States v. White</u>, 837 F.3d 1225, 1230–31 (11th Cir. 2016) (per curiam) (quotation omitted); <u>see also</u> <u>Davis v. Singletary</u>, 119 F.3d 1471, 1482 (11th Cir. 1997) ("To the extent of any inconsistency between our [earlier] pronouncements and the Supreme Court's supervening ones, of course, we are required to heed those of the Supreme Court.").  By applying <u>Willingham</u> to dismiss Ms. Jones's case, our Court has shirked its obligation.

B.

Beyond that, when the panel relied on Willingham's invalid immutable-trait requirement, it did not reach the wrong result for only Ms. Jones.  Sadly, it takes our entire Title VII disparate-treatment jurisprudence down a misguided path.  Since Price Waterhouse, this Court had applied Willingham only one time.  That was to uphold a sex-differentiated hair-length policy that was indistinguishable from the one at issue in Willingham.  See Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387 (11th Cir. 1998).[3]  Other than Harper, this Court has completely avoided Willingham's immutable-trait requirement.  The rarity with which we have invoked the Willingham requirement after Price Waterhouse suggests that— until now—our Court understood its requirement was no longer sound.[4]

The panel decision thus resurrects what had been, for good reason, a dead letter in this circuit.  And it does so in very broad terms.  Instead of limiting the

---

[3] In Harper, this Court disposed of the plaintiffs' claim in one sentence, saying it was "squarely foreclose[d]" by Willingham.  Harper, 139 F.3d at 1387.  There was no mention of Price Waterhouse.

[4] The decision in Glenn also makes clear this Court had rejected the immutable-trait requirement. In Glenn we held that "discrimination against a transgender individual because of her gender-nonconformity is sex discrimination."  Glenn, 663 F.3d at 1317.  This result, we explained, was compelled by Price Waterhouse.  Id. at 1316–17.  Glenn's holding is a stark repudiation of the immutable-trait requirement.  When an employer takes an adverse action against a transgender employee because of the employee's gender nonconformity, the employer is not discriminating based on an immutable characteristic of sex.  To the contrary, the employer has discriminated against the employee because the employee's appearance flouts the perceived immutability of sexual characteristics.  See id. at 1316 ("A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes.").  We have therefore recognized that the very act of changing one's appearance can be the basis of an employment discrimination claim.

immutable-trait requirement to cases involving grooming policies, the opinion appears to hold that the "immutable characteristic limitation" applies to all Title VII disparate treatment claims.  Catastrophe Mgmt., 852 F.3d at 1029; see, e.g., id. at 1021 ("[O]ur precedent holds that Title VII prohibits discrimination based on immutable traits . . . ."); id. at 1028 ("Title VII protects against discrimination based on immutable characteristics."); id. at 1030 ("Title VII protects persons in covered categories with respect to their immutable characteristics, but not their cultural practices.").  To the extent the panel opinion revives the immutable-trait requirement for sex discrimination claims, it directly contradicts our post-Price Waterhouse precedent recognizing sex discrimination claims based on gender nonconformity.  See Evans, 850 F.3d at 1254 ("Discrimination based on failure to conform to a gender stereotype is sex-based discrimination."); Glenn, 663 F.3d at 1316 (same).  After all, the crux of every gender-nonconformity claim is that the way an employee chooses to present her gender, through any number of mutable characteristics, is protected by Title VII.

My reading of the panel opinion tells me that the panel not only resurrects this damaging immutable-trait requirement, it expands that requirement.  It does so by applying the doctrine to disparate treatment claims alleging race discrimination.  Before Ms. Jones's panel opinion, this Court had never applied Willingham's immutable-trait requirement to a race-based disparate treatment claim.  Now, the

25

panel has extended the doctrine to race claims, which pushes the invalid doctrine into a whole new category of Title VII claims. Willingham mentioned race only once. It said that "race" itself is an "immutable characteristic[]" and therefore protected under Title VII. 507 F.2d at 1091 ("Equal employment opportunity may be secured only when employers are barred from discriminating against employees on the basis of immutable characteristics, such as race and national origin."). In other words, Willingham used the concept of immutability to identify race as a characteristic that is a prohibited basis for employer decision-making. Willingham never said anything about using immutability against a racial group to exclude certain features of racial identity from statutory protection.[5] See Camille Gear Rich, Performing Racial and Ethnic Identity: Discrimination by Proxy and the Future of Title VII, 79 N.Y.U. L. Rev. 1134, 1216, 1220 (2004) (recognizing this flaw in the extension of the "immutability construct" to claims of race discrimination).

It isn't hard to see why an immutable-trait requirement has no place in the race-discrimination context. The doctrine presumes that there are immutable, or naturally-occurring physical differences between racial groups. This, even though

---

[5] In Garcia, the former Fifth Circuit applied the immutable-trait requirement to a claim of national-origin discrimination, upholding an employer's English-only policy. See 618 F.2d at 270. But the court said nothing about applying the requirement in the context of race discrimination. Rather, as far as race is concerned, Garcia made only the same point as Willingham—that the racial classifications themselves are immutable and therefore protected. See Garcia, 618 F.2d at 269 ("No one can change his place of birth (national origin), the place of birth of his forebears (national origin), his race or fundamental sexual characteristics.").

26

both the academy and the courts have long rejected the notion that racial divisions

are based on biological differences.  See Ian F. Haney Lopez, The Social

Construction of Race: Some Observations on Illusion, Fabrication, and Choice, 29

Harv. C.R.-C.L. L. Rev. 1, 11–20  (1994) (collecting sources and explaining that

"[t]he rejection of race in science is now almost complete").  Summarizing the

findings of "[m]any modern biologists and anthropologists," the Supreme Court

told us three decades ago:

> Clear-cut [racial] categories do not exist. The particular traits which
> have generally been chosen to characterize races have been criticized
> as having little biological significance. It has been found that
> differences between individuals of the same race are often greater than
> the differences between the "average" individuals of different races.

Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 610 n.4, 107 S. Ct. 2022,

2026 n.4 (1987).

The supposed distinction between an "immutable" racial trait and a

"mutable" one is illusory.  Is the color of an employee's hair an immutable trait?

What about the shape of an employee's nose?  It seems to me that employers could

use the panel's rule to argue that any case in which the employer hasn't overtly

discriminated on the basis of skin color itself falls outside of Title VII's

protections.  And even that may be questionable, because with modern medicine

skin color can be changed too.  See Margaret L. Hunter, Buying Racial Capital:

27

Skin-bleaching and Cosmetic Surgery in a Globalized World, 4 J. Pan Afr. Studies 4, 142–64 (2011).

The panel opinion itself shows us that the notion of an "immutable" racial characteristic is fiction. In an effort to give lower courts an example of "the distinction between immutable and mutable characteristics of race," the panel draws a bright line between dreadlocks and an Afro. Catastrophe Mgmt., 852 F.3d at 1030. The panel actually says that while dreadlocks, a "black hairstyle," is a "mutable choice" and therefore not protected, an Afro, "black hair texture," is an "immutable characteristic" and is therefore protected. Id. This distinction is nonsense. If an immutable trait is something that is "beyond the [plaintiff]'s power to alter," id. at 1029 (quotation omitted), then neither dreadlocks nor Afros are immutable traits of black people. Like any hair style, both can be altered.

In fact, the very case the panel relies on for the proposition that Afros are an immutable characteristic, Jenkins v. Blue Cross Mutual Hospital Insurance, Inc., 538 F.2d 164 (7th Cir. 1976) (en banc), disproves the point. See Catastrophe Mgmt., 852 F.3d at 1030 (citing Jenkins, 538 F.2d at 168). In Jenkins, the Seventh Circuit held that a black employee's allegation that she was denied a promotion because she wore her hair in an Afro stated a Title VII claim for race discrimination. 538 F.2d at 168. But contrary to Ms. Jones's panel's assertion that an Afro constitutes "an immutable characteristic," Catastrophe Mgmt., 852 F.3d at

28

1030, the <u>Jenkins</u> decision actually highlights the mutability of an Afro.  In

<u>Jenkins</u>, the plaintiff made the choice to style her hair in an Afro after years of

wearing her hair differently.  538 F.2d at 167.  The plaintiff affirmatively alleged

that she worked for her employer for three years with "no problem until May 1970

when I got my natural hair style."  <u>Id.</u> at 167; <u>see also</u> <u>id.</u> at 168–69 (repeatedly

describing the plaintiff's Afro as a "hairstyle").  The Seventh Circuit concluded

that an allegation of discrimination based on a black employee's Afro stated a

claim under Title VII not because an Afro is an immutable characteristic of black

people, but instead because singling the plaintiff out on account of her "Afro

hairstyle was merely the method by which the plaintiff's supervisor [] expressed

the employer's racial discrimination."  <u>Id.</u> at 168.

The discriminatory animus that motivates an employer to ban dreadlocks

offends the antidiscrimination principle embodied in Title VII just as much as the

discriminatory animus motivating a ban on Afros.  Both are distinctly African-

American racial traits.  So, when an employer refuses to hire or promote a black

employee on the basis of one of those traits, there is a strong indication that the

employee's race motivated the decision.  In other words, when an aspect of a

person's appearance marks her as a member of a protected class and her employer

then cites that racial marker as the reason for taking action against her, the

employee's race probably had something to do with it.  Whether that racialized

29

aspect of her appearance is "immutable" such as skin color or "mutable" such as hair is beside the point. Either way, the employer's action based on a racial identifier is an action based on the employee's race.

In order to faithfully apply Title VII's ban on racial discrimination, courts must identify discriminatory intent in all its disguises. That is why we instruct district courts to look for "circumstantial evidence . . . [of] the employer's discriminatory intent," however that intent may manifest. Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011); see also Ash v. Tyson Foods, Inc., 546 U.S. 454, 456, 126 S. Ct. 1195, 1197 (2006) (per curiam) (holding that even a facially race-neutral remark may be "probative of bias," "depend[ing] on various factors including context, inflection, tone of voice, local custom, and historical usage"). Yet the panel opinion forces courts in Alabama, Florida, and Georgia to close their eyes to compelling evidence of discriminatory intent. This flies in the face of the broad mandate courts have been given in disparate treatment cases.

In concluding this debate between two appeals court judges, neither of us African American, about what is an immutable characteristic of African American hair, the ironies are not lost on me. Ms. Jones is not going to be impacted much by which view ultimately prevails in what Judge Jordan refers to as the "[d]ebates [that] rage in the academy (as well as in society) over whether race is biological,

30

cultural consensus-based, or some or none of the above." Ms. Jones's complaint plainly sets out facts that plausibly support her claim that CMS withdrew her job offer based on a marker of her race. As you've read, Judge Jordan himself recognizes that there is "no legal or factual agreement" about the relationship between a person's hair style and her race. That being the case, Ms. Jones had every reason to come into federal court, seeking to have a jury instructed on the law that governs this dispute, and then decide these facts about which we cannot agree. Ms. Jones should have had that opportunity.

C.

In the ways I have set out, the panel went astray when it invoked Willingham's immutable-trait requirement to dismiss the EEOC's complaint. I will now review how the EEOC's allegations should have been analyzed. Once we put aside the no-longer valid immutable-trait requirement and instead analyze the complaint under the stereotyping doctrine from Price Waterhouse, the complaint easily sets out a plausible claim for race-based disparate treatment. It therefore should have survived CMS's motion to dismiss. See Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1289 (11th Cir. 2010) ("[T]o survive a motion to dismiss, a complaint must [] contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).

31

Price Waterhouse teaches that, for purposes of Title VII, it does not matter whether the trait the employer disfavors is mutable or immutable.  What matters is whether that trait is linked, by stereotype, to a protected category.  See 490 U.S. at 251, 109 S. Ct. at 1791.  Price Waterhouse didn't refuse to promote all employees who are women (an "immutable" trait).  It refused to promote a subset of women: those who failed to conform to a stereotype of how a woman should look in the workplace.  See id. at 235, 109 S. Ct. at 1782 ("Hopkins [was told she needed to] . . . dress more femininely, wear make-up, have her hair styled, and wear jewelry.").  CMS's ban on dreadlocks works the same way.  The company might not refuse to hire all black applicants.  Rather, it refuses to hire a subset of black applicants: those who, because of their hair, fail to conform to a stereotypical notion of how a black person should look in the workplace.[6]

The EEOC clearly alleged that dreadlocks are a stereotyped trait of African Americans.  The complaint explains that the perception that dreadlocks are "unprofessional" and "not neat" is grounded in a deep-seated white cultural association between black hair and dirtiness.  This perception has origins in slavery itself.  See Doc. 21-1 ¶ 20 (alleging that the term "dreadlock" originated during the slave trade, when "slave traders referred to the slaves' hair as 'dreadful'" because

---

[6] This Court's precedent made clear, nearly a decade before Price Waterhouse, that the reach of Title VII "is not to be diluted because discrimination adversely affects only a portion of the protected class."  Jefferies v. Harris Cty. Cmty. Action Ass'n, 615 F.2d 1025, 1034 (5th Cir. 1980) (quotation omitted); see id. at 1033 ("[D]isparate treatment of a subclass of women could constitute a violation of Title VII . . . .").

32

slaves' hair often "became matted with blood, feces, urine, sweat, tears, and dirt" during the transatlantic voyage). Thus, the complaint plainly asserts, the "assumption" that "dreadlocks inevitably will get messy" is "based on stereotyped notions of how Black people should and should not wear their hair and is premised on a normative standard and preference for White hair."

The EEOC also alleged that CMS relied on this racial stereotype when it rescinded Ms. Jones's job offer. To begin, there is certainly daylight between CMS's formal, written grooming policy, which did not single out any particular hairstyle, and its informal, unwritten ban on dreadlocks. CMS's written grooming policy was race neutral: all employees' hairstyles must "reflect a business/professional image" and must not be "excessive." Yet CMS then decided to interpret this race-neutral policy to ban a particular type of hairstyle. According to the complaint, the hairstyle selected by CMS typically grows "naturally" only in black people's hair and not in white people's. Ms. Jones was told that CMS could not hire her with dreadlocks. CMS's ban on dreadlocks therefore appears to be categorical, presumably meaning that the company views all dreadlocks as "excessive" and lacking a "business[like]/professional image." As the human resources manager, Ms. Wilson, explained to Ms. Jones, the problem with dreadlocks is "they tend to get messy." But again, the complaint explained that CMS's "assumption that [] dreadlocks inevitably will get messy" is grounded in

33

"stereotyped notions" of black physical characteristics and a racial preference for employees with characteristically white traits. Thus, taking the facts alleged in the complaint as true, CMS's stated reason for not hiring Ms. Jones was plainly a racial stereotype.

Price Waterhouse tells us that an employer's mere mention of a stereotype related to the employee's protected class does "not inevitably prove that [the employee's protected status] played a part in [the] particular employment decision." 490 U.S. at 251, 109 S. Ct. at 1791. Instead, the plaintiff has the burden to "show that the employer actually relied on her [protected class] in making its decision," and "stereotyped remarks can certainly be evidence" of that. Id.

Again, this case was decided on the pleadings. The EEOC therefore had no obligation to prove that CMS reneged on Ms. Jones's job offer because of her race. It only had to allege facts to show this is plausible. Twombly, 550 U.S. at 570, 127 S. Ct. at 1974. I view the allegations I've discussed as sufficient to support a plausible claim that CMS relied on Ms. Jones's race in deciding to revoke her offer of employment. The stereotyping here, like that in Price Waterhouse, "did not simply consist of stray remarks" by a non-decisionmaker. See 490 U.S. at 251, 109 S. Ct. at 1791. The racial stereotype was the express reason, indeed the only reason, CMS gave for not hiring Ms. Jones. And it came straight from the manager who decided not to hire her. See Quigg v. Thomas Cty. Sch. Dist., 814

34

F.3d 1227, 1242 (11th Cir. 2016) (holding that remarks based on sex stereotypes constituted circumstantial evidence of sex discrimination sufficient to overcome summary judgment where the remarks were made "during conversations about" the employment decision; "in relative temporal proximity to" the decision; and "specifically refer[ed] to" the company's preferences).

But the EEOC's complaint alleged another fact that shows, above and beyond plausibility, that CMS "actually relied on" Ms. Jones's race in deciding to rescind her offer.  See Price Waterhouse, 490 U.S. at 251, 109 S. Ct. at 1791. Immediately after Ms. Wilson gave Ms. Jones the purported nondiscriminatory reason for CMS's dreadlocks ban—"they tend to get messy"—she acknowledged that reason did not apply to Ms. Jones's hair: "I'm not saying yours are [messy]." CMS thus recognized the distinction between dreadlocks that are truly "messy" and dreadlocks that aren't, and demonstrated it can tell the difference between the two.  Even so, after it acknowledged that Ms. Jones's hair wasn't messy, CMS enforced the dreadlocks ban against her anyway.  This did nothing to further the nondiscriminatory reason CMS gave for the company's dreadlocks ban.  Because CMS openly acknowledged that its only nondiscriminatory reason for the dreadlocks ban did not apply to Ms. Jones, we are left with only her race as the basis for its decision not to hire her.  There is no other explanation for the

35

company's refusal to hire a black applicant whose dreadlocks it recognizes do not implicate its one nondiscriminatory reason for banning dreadlocks.

### D.

I have examined why the panel was wrong to apply the immutable-trait requirement and why, under Price Waterhouse, the EEOC's complaint states a claim for race discrimination. But even if we were to ignore Price Waterhouse and apply Willingham's immutable-trait requirement, the panel still reached the wrong result. The complaint clearly alleges that dreadlocks are an immutable trait that satisfies the Willingham requirement.

The panel says it defines an "immutable" trait as one that is "beyond the [plaintiff]'s power to alter," Catastrophe Mgmt., 852 F.3d at 1029 (quoting Garcia, 618 F.2d at 269), so characterizing dreadlocks as mutable might sound right. No one disputes that dreadlocks can be altered. Indeed, the complaint specifically described the "expensive and harsh treatments" that many African Americans use to "straighten their hair" "[i]n response to a pervasive animus toward the natural texture of Black people's hair." It also alleged that African Americans "wear wigs, hair pieces, or extensions to create an appearance that is consistent with Caucasian hair and style standards."

So the question of whether dreadlocks are "immutable" for purposes of Willingham depends entirely on how we define that term. "[B]eyond the

[plaintiff]'s power to alter" is certainly the definition that supports the panel's holding that dreadlocks are not immutable. Id. However, in order to justify its distinction between Afros and dreadlocks, the panel uses another definition of the term. Certainly, "beyond the [plaintiff]'s power to alter" is not the definition of "immutable" that would support holding an Afro to be immutable. The same "expensive and harsh treatments" that a black person can use to turn dreadlocks into Caucasian-looking hair can be used to the same effect on an Afro. Thus, the panel turns to a different set of definitions of "immutable." Those are: "characteristics [that] are a matter of birth, and not culture," id. at 1027; "inherited physical characteristics," id.; "[characteristics] that an employee is born with," id. at 1029 n.4; and, a characteristic that is not "'the product of . . . artifice,'" id. at 1030 (quoting Rogers v. Am. Airlines, Inc., 527 F. Supp. 229, 232 (S.D.N.Y. 1981)). Taken together, the panel defines "immutable" as a trait that is naturally occurring.

Using this definition of "immutable," the complaint certainly alleged the immutability of dreadlocks. The complaint said "[d]readlocks are formed in a Black person's hair naturally, without any manipulation." (Emphasis added.) It also referred to dreadlocks as the "natural texture" of black hair and "African Americans['] . . . natural hair." And it explained that "[g]enerally, the hair of Black people naturally grows in very tight coarse coils. In contrast, the hair of

37

White people typically grows straight or in softly curled patterns." Finally, the complaint described dreadlocks as "physiologically and culturally associated with people of African descent." (Emphasis added.) If this isn't enough to allege that dreadlocks occur naturally in black people's hair, I don't know what is.[7]

The panel evidently believed that an Afro is black hair in its natural, unmediated state, while dreadlocks are not. But at the motion to dismiss stage, we must accept all of the factual allegations in the complaint as true. Erickson v. Pardus, 551 U.S. 89, 93–94, 127 S. Ct. 2197, 2200 (2007) (per curiam). The panel did not do that. In concluding that the EEOC's complaint "did not allege that dreadlocks are an immutable characteristic of black persons," Catastrophe Mgmt., 852 F.3d at 1022, the panel ignored the plaintiff's well-pled allegations that dreadlocks occur "naturally" in a black person's hair. Instead, the panel substituted its own notion that the only natural black hair is an Afro.

\*       \*       \*

The appearance of a person's hair is always capable of change—hair can be cut, straightened, curled, or covered. The question is whether Title VII protects a black employee's choice to wear her hair in its natural state. The panel concedes it

---

[7] The complaint also alleged, in the alternative, that "even if [dreadlocks] [are] not an immutable characteristic," they are, "[s]imilar to the Afro, . . . a manner of wearing hair that is suitable to the texture of Black hair and that has been worn by Black individuals as a cultural symbol."

does.  See id. at 1030.  That leaves only the question of whether the EEOC's complaint sufficiently alleged that dreadlocks are natural hair.  It does.

### III.  CONCLUSION

"[T]he very purpose of [T]itle VII is to promote hiring on the basis of job qualifications, rather than on the basis of race or color."  Griggs v. Duke Power Co., 401 U.S. 424, 434, 91 S. Ct. 849, 855 (1971) (quotation omitted).  Although instances of open and obvious racial discrimination in the workplace still exist, intentional discrimination may now take on more subtle forms.  In many cases an employer's racial preference will be camouflaged by policies that appear facially neutral.  That is what the EEOC alleged happened to Ms. Jones.  A ban on "all" applicants with dreadlocks is about as race-neutral as a ban on "all" applicants with dark-colored skin.

The panel's conclusion that, as a matter of law, a blanket ban on dreadlocks does not violate Title VII's prohibition on disparate treatment is simply wrong.  And so is the immutable-trait requirement the panel used to get there.  If Title VII prohibits an employer from rescinding a job offer because it perceives a female applicant's appearance to be insufficiently feminine (or overly masculine), see Price Waterhouse, 490 U.S. at 256, 109 S. Ct. at 1794, it must also prohibit an employer from rescinding an offer because it perceives a black applicant's appearance to be insufficiently white (or overly black).  My colleague Judge

39

William Pryor recently pointed out that a female employee "can state a claim that she experienced . . . [sex] discrimination for wearing a 'male haircut.'" Evans, 850 F.3d at 1258 (William Pryor, J., concurring).  By the same logic, a black employee like Ms. Jones should be able to state a claim of race discrimination for wearing her hair in dreadlocks—a "black haircut."

Surely, the viability of Title VII cannot rest on judges drawing distinctions between Afros and dreadlocks.  Yet that is what the panel opinion seems to call for.  The opinion requires courts and litigants to engage in a pseudo-scientific analysis of which racial traits occur naturally and which do not.  This is not how we should be deciding cases of race discrimination.

There was a time in our nation's history when a person's legal status was dictated by whether she was white or black.  Courts frequently adjudicated the physical features that "[n]ature has stampt upon the African and his descendants."[8] Hudgins v. Wright, 11 Va. 134, 139 (Va. 1806) (stating that a "woolly head of hair" is the "strong[est] [] ingredient in the African constitution" (emphasis omitted)).  Today we count those decisions among the most shameful in the history of our courts.  And, of course, Congress's purpose in passing Title VII was to eliminate one of the many stubborn vestiges of that era.  Our task, in applying that statute today, is to be true to that most important goal.  The panel opinion is not.

---

[8] See generally Ariela J. Gross, Litigating Whiteness: Trials of Racial Determination in the Nineteenth-Century South, 108 Yale L.J. 109 (1998).

Rather, in holding that certain physical features are immutable traits of the different racial groups, this Court legitimizes the very categories that Title VII was intended to dismantle.

I respectfully dissent.